**Opinion issued October 20, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00866-CV

———————————

**RSM PRODUCTION CORP. AND JACK GRYNBERG, Appellants**

**V.**

**GLOBAL PETROLEUM GROUP, LTD., Appellee**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-74337**

---

## O P I N I O N

Appellants, RSM Production Corp. and Jack Grynberg (collectively, "RSM"), sued appellee Global Petroleum Group, Ltd. ("Global") and other entities for misappropriation of trade secrets and other claims based on the alleged misuse of certain seismic data. Global filed a special appearance, which the trial court

granted. RSM argues, in its sole issue on appeal, that the trial court erred in granting Global's special appearance.

We affirm.

## Background

RSM Production Corp. is a corporation registered in Texas with its principal place of business in Colorado, and Jack Grynberg is a Colorado resident. RSM alleged that Grynberg spent twenty-five years and three million dollars exploring off the coast of Grenada and gathering seismic data about potential oil and natural gas reserves in that area. In 1996, Grynberg created a report using the seismic data he had collected and formed RSM Production Corp. to contract with the Grenadian government to further explore the area.

Global is a Grenadian limited liability company with its principal place of business in Grenada. RSM alleged that Global misappropriated its seismic data by exploiting the connections of Global's founder, Lev Model, who is a New York resident.[1] According to RSM's allegations, Grynberg approached British Petroleum Exploration Co. ("BPX"), a British corporation, about collaborating in developing the Grenadian offshore oil and gas reserves. RSM alleged that BPX made copies of the seismic data in 1999 without Grynberg's knowledge or consent and kept them

---

[1] Model is also a defendant in this suit, but the issue of the trial court's personal jurisdiction over him is not before this Court.

in its London offices. BPX later formed a joint venture called TNK-BP[2] in 2003, and Model was "affiliated" with TNK-BP.[3] Model founded Global later in 2003, and RSM alleged that Global obtained RSM's proprietary seismic data through its connections at BPX and TNK-BP without Grynberg's permission. RSM claims that Global has possessed the seismic data since at least 2008 and began using the data in 2013 to explore and develop Grenada's offshore oil and natural gas reserves pursuant to an exploration license granted to Global by the Grenadian government.

RSM also alleged that Global unlawfully disseminated the seismic data. RSM asserted that Global used the data for commercial purposes, including by giving it to the following companies in conjunction with contracts it entered in 2013 related to its Grenada project: Tricon Geophysics, Inc. ("Tricon"), a Colorado company with its principal place of business in Colorado and an office in Houston, Texas; Blackwater Subsea LLC ("Blackwater"), a Texas limited liability company with a Houston office; and SeaBird Exploration, America, Inc. ("SeaBird"), a Texas corporation based in Houston.

---

[2]  RSM's pleadings identify TNK-BP only as "One of the biggest . . . seismic scientific investment compan[ies] in the world" that "did work in the US and the UK and (sic) China." TNK-BP is not a defendant below or a party to this appeal, and RSM's pleadings do not provide any other information regarding TNK-BP's place of incorporation, principal place of business, or areas of operation. A motion for summary judgment also contained in the record stated that TNK-BP is a joint venture between BP and a Russian company called TNK.

[3]  RSM's pleadings do not provide any additional allegations about Model's role at TNK-BP or how he was connected to BPX.

On December 12, 2013, RSM sued Global, Tricon, Blackwater, and SeaBird in Houston, Texas for misappropriation of trade secrets and for "breach of confidence" under Grenadian and English common law stemming from their use and dissemination of the seismic data. RSM sought temporary and permanent injunctive relief, actual and exemplary damages, costs, and interest.

On February 10, 2014, Global filed a special appearance and plea to the jurisdiction.[4] Global argued that it is not a Texas corporation and has no offices, employees, assets, or registered agents here. Global further asserted that it did no business in Texas and did not advertise in Texas. Global also argued that RSM's petition did not identify any contacts between Global and Texas other than Global's contracts with Tricon, SeaBird, and Blackwater, which were not adequately connected to RSM's allegations against it.

Global argued that it sought to explore hydrocarbon potential off the coast of Grenada and that, in 2008, it obtained an exploration license from the Grenadian government permitting it to do so. Global asserted that it obtained "certain vintage 2D seismic data," including the allegedly misappropriated data that is the subject of this suit, from the Grenadian government in connection with its exploration license on March 4, 2008. The development project was put on hold in late 2008 because of changes in the Grenadian political climate.

---

[4] The question of the trial court's personal jurisdiction over the remaining defendants is not before this Court in this interlocutory appeal.

Global asserted that, after the Grenadian political climate improved in 2013, the project was reinstated. In March 2013, Global entered into a contract with Tricon via Tricon's Venezuela office to process and interpret the previously acquired vintage 2D seismic data. Pursuant to this contract, Global provided a digital copy of the data, including the allegedly misappropriated data that is the subject of this suit, to Tricon representatives in Grenada, and later that year provided the hard copy of that same data to Tricon in Venezuela. Global asserted that Tricon unilaterally subcontracted with a third-party—Houston-based Interactive Exploration Solutions, Inc. ("INEXS")—to perform portions of that work and that Tricon provided some of the relevant, processed 2D data to INEXS. Global further argued that its remaining contracts with entities connected to Texas were not related to the use of the relevant 2D data and that it did not disclose to those parties any of the relevant 2D data.

In support of its challenge to the trial court's personal jurisdiction over it, Global provided declarations from various individuals involved in the Grenadian development project. Marco Angeli, a Venezuelan and Italian citizen working out of Venezuela, was a consultant for Global and had been overseeing the Grenada development project. He stated that Global was formed in and has its principal place of business in Grenada and that Global does not conduct business in or have offices in Texas. Angeli personally met with representatives from Texas companies

5

on three occasions in 2013 to discuss Grenada's offshore oil reserves. Regarding Global's contracts for the Grenada development project, Angeli stated that he "negotiated contractual terms for work to be performed for [Global] in Grenada via e-mail with a Tricon representative in Venezuela and with a Seabird representative in England" and that Global "did not enter into any contracts or disclose any information at issue in the above-captioned lawsuit" in Texas. He declared that only representatives at Tricon received or saw the "vintage 2D seismic data," including RSM's data, that Global possessed. Specifically, he stated:

> None of the other entities who worked with [Global] in its exploration efforts—including defendants Blackwater and Seabird—ever had access to or received this information. Similarly, INEXS, a non-party contractor who was hired to interpret seismic data, was never provided access to this information; rather, it only received processed digital information that was prepared by Tricon. As such, [Global] never gave INEXS any information, including the so-called "Grynberg lines."

Mikhail Zhabin, a citizen of the United Kingdom who works as an executive assistant to Global's directors, stated that Global had multiple sources for its seismic data, including the Grenadian government. Zhabin stated that Global received the portion of data containing RSM's seismic data in 2008 from the Grenadian government and subsequently provided it to Tricon in Grenada and Venezuela for processing. Attached to his declaration was a receipt indicating that he received some seismic data, including RSM's data, from the Grenadian

government in 2008 and a shipping receipt to support his statement that he sent hard copies of the 2D seismic data to Tricon in Venezuela.

Vincenzo de Lisa, Global's senior geophysicist, declared that he sent only Tricon's finished work product—seismic data that Tricon had processed into a format that was usable by computers—to INEXS, a Houston-based company.

Dan Ward, INEXS's vice president of operations, declared that INEXS "was retained by Tricon to interpret certain 2D seismic data processed by Tricon." INEXS could not interpret portions of Tricon's digital data and requested access to the original paper data. A Tricon representative took some paper data to Houston, and Ward recalled that one of the paper sections was marked "GRYNBERG-1." Ward asserted, however, that due to the age of the data and "navigational problems associated with the seismic lines," none of Grynberg's seismic data—i.e., RSM's allegedly proprietary data—was usable. The data was "of no value to the interpretation and mapping work performed by INEXS" and was not interpreted by INEXS.

RSM responded to the special appearance, asserting that jurisdiction was proper based on Global's extensive contacts in Texas. RSM also asserted that the trial court could exercise specific jurisdiction over Global here because Global hired contractors who used and processed the seismic data in Houston, entered into contracts with Houston companies, is indemnifying Texas entities in connection

7

with this litigation, sent representatives to Houston on at least six occasions to discuss the seismic data and its interpretation, and sent emails to Houston related to the seismic data. RSM alleged that Global transferred the seismic data to Tricon, who used it and then passed it on to INEXS to process in Houston. RSM also pointed to contracts between Global and five other companies relating to Global's activities in developing the Grenadian offshore oil and gas reserves:

- a March 11, 2013 contract between Global and GX Technologies, a Texas company based in Houston, to obtain a license to use 2D seismic data from a third party.

- a July 17, 2013 contract between Global and Oreo Navigation Company, Ltd. ("Oreo")—a wholly-owned subsidiary of SeaBird that was incorporated in Cypress and whose registered address was in Dubai—providing for Oreo to conduct a marine 3D seismic survey in the Grenada offshore sedimentary basin.

- a July 20, 2013 contract between Global and Blackwater for Blackwater to create a development plan and provide project management for the initial drilling phase in the Grenadian offshore reserves, scheduled to begin in 2014.

- a July 31, 2013 contract between Global and INEXS to evaluate and process 3D seismic data acquired pursuant to Global's contract with SeaBird's subsidiary, Oreo.

- an August 7, 2013 contract between Global and Tricon to process seismic data.

RSM deposed Angeli and Zhabin. Angeli testified that most of Global's work was done through contractors and that most of Global's technical workers were located in Venezuela. Angeli believed most of Tricon's work for Global

would be performed at Tricon's Venezuela offices. Regarding the use of RSM's data, Angeli testified about the different sources of the seismic data that Global used, including vintage 2D data that Global obtained from the Grenadian government—data that included RSM's allegedly proprietary data in addition to data from other sources—2D data obtained from third parties pursuant to different licensing agreements, and data obtained by Global and/or Tricon. He testified that the vintage 2D data that included RSM's data was of "very limited" use and that Global eventually had to procure more data from other entities. RSM's attorney asked, "But they were useful?"; Angeli responded, "In a way, yes, because it was integrated into the whole picture." Angeli also testified that INEXS received in Houston some of the 2D seismic data from Tricon's Venezuela office. Global produced emails indicating that the seismic data, including paper copies of a portion of RSM's seismic data, was located in Houston for at least some period of time, and Angeli stated that he collected that data and returned it to Grenada in January 2014, following RSM's filing of the instant suit.

Angeli also discussed his meetings in Houston. He testified that he had visited Houston on four occasions in connection with the Grenada project—three times in 2013 and once in 2014. On or around June 4, 2013, Angeli met with representatives from Blackwater and INEXS. He stated that the purpose of this meeting was for his contacts with Tricon to introduce him to representatives of

9

INEXS and that INEXS's representatives also introduced him to representatives from Blackwater. Dan Ward from INEXS presented some "preliminary" results based, at least in part, on processed 2D data that Global had received from the Grenadian government and other data obtained by Tricon. In its responses to RSM's interrogatories, Tricon stated that the participants at the meeting "discussed the hydrocarbon potential of the concession in general and technical terms." Angeli further testified that at that point Blackwater was working on a "pre-feasibility study" regarding the possibility of creating the necessary infrastructure for moving any gas produced from offshore Grenada to Trinidad for further processing.

Angeli also attended a meeting on or about June 25, 2013, in Houston, in which he and Oscar Zuloaga, another Global employee working on the Grenada project, met with representatives of Blackwater and discussed a preliminary report on "potentional reservoirs" in Grenadian offshore areas that Blackwater had mapped based on the study by Tricon and INEXS. Angeli stated that the report from this meeting did not involve seismic data. Around this same time, de Lisa, Global's geophysicist, also met with INEXS in Houston to discuss the interpretation of the vintage 2D data, and Angeli believed that this 2D data included at least some of the government-provided data.

Angeli also met with SeaBird/Oreo in Houston on or around June 26, 2013, regarding Global's contract with those companies to provide 3D mapping services,

and he stated that he sent the 3D seismic data obtained by SeaBird's vessel to Houston. Angeli further stated that he met with SeaBird/Oreo regarding the procurement of 3D data again in September or October 2013. He testified that Tricon and INEXS created the map SeaBird used for collecting 3D data based on their work with the vintage 2D data obtained from the Grenadian government (some of which was RSM's proprietary data) and data from at least two other sources obtained by license.

Finally, Angeli's deposition and other discovery established that Dan Ward from INEXS and Zuloaga from Global met with Tricon in Houston "regarding the processing of the newly acquired 3D [data collected by SeaBird]" in September 2013. And Zuloaga attended an additional meeting in Houston with other people associated with Global's Grenada project in October 2013.

Zhabin testified that he initially transferred the 2D seismic data, including the allegedly misappropriated data, to Tricon on a USB drive in Grenada. Zhabin explained that the work commissioned by Global from Tricon was to develop the seismic data in order to "inform the next stage of the development process, namely identifying the most prospective areas for more detailed 3D exploration with a view to . . . drilling and development." Zhabin did not have much contact with Tricon, but other Global representatives were in "regular" contact with people at Tricon. Zhabin communicated on occasion with individuals and companies in

11

Houston in order to organize and coordinate travel and meeting plans. Zhabin provided detailed testimony regarding Global's representatives' trips to Texas. Angeli and other Global representatives made at least three trips to Houston—there was one visit to Texas in 2008, three trips in 2013, and several in 2014, after RSM had filed suit. One of the 2014 trips was to find local counsel to represent Global in this lawsuit. Zhabin stated that in a January 13, 2014 visit, Angeli received the paper copies of the 2D seismic data to take back to Grenada, and another visit was conducted for Global business related to the Grenada offshore fields.

The trial court sustained Global's special appearance, dismissing RSM's claims against it for lack of personal jurisdiction, leaving Tricon, Blackwater, and SeaBird as defendants in the underlying suit. RSM filed this interlocutory appeal from the order granting the special appearance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

## Special Appearance

RSM contends that the trial court erred in granting Global's special appearance.

## A. Standard of Review

Whether a court can exercise personal jurisdiction over a nonresident defendant is a question of law, and thus "we review de novo the trial court's determination of a special appearance." *Kelly v. Gen. Interior Constr., Inc.*, 301

12

S.W.3d 653, 657 (Tex. 2010); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). However, the trial court frequently must resolve questions of fact before deciding the jurisdictional question. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). "When [as here] a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied." *Id.* at 795.

Texas courts may exercise personal jurisdiction over a nonresident if the long-arm statute authorizes it, consistent with federal and state constitutional due-process guarantees. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). The long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" or "commits a tort in whole or in part" in Texas, and it provides a non-exhaustive list of activities that constitute "doing business" in Texas. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2015); *BMC Software*, 83 S.W.3d at 795 (holding that long-arm statute extends Texas courts' jurisdiction "as far as the federal constitutional requirements of due process will permit").

Personal jurisdiction over a nonresident is consistent with due process when the nonresident has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and

substantial justice. *Moki Mac*, 221 S.W.3d at 575 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). In most cases, the exercise of jurisdiction over a nonresident defendant will not conflict with notions of fair play and substantial justice if the nonresident has minimum contacts with the forum. *Moncrief Oil*, 414 S.W.3d at 154–55. "A defendant establishes minimum contacts with a state when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)).

The Supreme Court of Texas has identified three distinct aspects of the "purposeful availment" requirement. First, only the defendant's contacts with the forum are relevant. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). A defendant should not be called to court in a jurisdiction solely as a result of the unilateral activity of another party or third person. *Id.* Second, the acts relied on must be purposeful, as opposed to random, isolated, or fortuitous. *Id.* Third, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.*

A defendant's contacts can vest a court with either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795. Here, RSM asserts that Global's

14

contacts with Texas vest the court with specific jurisdiction. Specific jurisdiction is established when the claims in question arise from or relate to the defendant's purposeful contacts with Texas. *Kelly*, 301 S.W.3d at 657–58. When a defendant challenges the exercise of personal jurisdiction in a special appearance, the plaintiff and the defendant bear shifting burdens. *Id.* at 658. The initial burden is on the plaintiff to plead sufficient allegations to establish jurisdiction over the defendant. *Id.* After the plaintiff meets its initial burden, the burden then shifts to the defendant to negate all bases of jurisdiction alleged by the plaintiff. *Id.*

The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659. To negate jurisdiction on a factual basis, the defendant can "present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id.* Alternatively, the defendant can negate jurisdiction on a legal basis by showing that, "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

## B. Specific Jurisdiction

In conducting a specific jurisdiction analysis, we focus on the relationship among the defendant, the forum, and the litigation. *Id.* at 658. "[F]or a nonresident

defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585 ("Our limited jurisprudence . . . suggests a middle ground, more flexible than substantive relevance but more structured than but-for relatedness, in assessing the strength of the necessary connection between the defendant, the forum, and the litigation.") (citing *Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 229–33 (Tex. 1991), and *Rush v. Savchuk*, 444 U.S. 320, 329, 100 S. Ct. 571 (1980)); *see also Shell Compania Argentina de Petroleo, S.A. v. Reef Expl., Inc.*, 84 S.W.3d 830, 837 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (stating contacts "must have a 'substantial connection' that results in the alleged injuries").

Personal jurisdictional analysis "always centers on the defendant's actions and choices to enter the forum state and conduct business." *Kelly*, 301 S.W.3d at 660. The mere existence of a cause of action against Global is not enough: RSM was required to "plead and, when challenged by the defendants, present evidence" that Global's relevant acts connected to RSM's claims "occurred, at least in part, in Texas." *See Kelly*, 301 S.W.3d at 660–61. As Global points out in its briefing on appeal, the parties in this case presented the trial court with "often-times competing evidence from either side (and at other times, wholly uncontroverted evidence presented by [Global])." Thus, the trial court was required to resolve some

16

questions of fact before deciding the jurisdictional question. *See BMC Software*, 83 S.W.3d at 794. The trial court did not issue findings of fact and conclusions of law with its special appearance ruling, so "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795; *see Moncrief Oil*, 414 S.W.3d at 150.

RSM has sued Global for misappropriation of trade secrets, and any exercise of personal jurisdiction by Texas courts over Global must arise out of Global's contacts with this state that are substantially related to that claim. *See Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 585. Under Texas law, a plaintiff can recover for misappropriation of trade secrets by establishing (1) the existence of proprietary information or a trade secret, (2) a breach of a confidential relationship or improper discovery of the information or secret, (3) a use of the information or secret without the plaintiff's authorization, and (4) resulting damages. *Calce v. Dorado Expl., Inc.*, 309 S.W.3d 719, 737–38 (Tex. App.—Dallas 2010, no pet.).[5] "Use of a trade secret means commercial use by which the offending party seeks to profit from the use of the secret," and includes "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the

---

[5] RSM's brief on appeal does not provide any authority regarding the elements of a "breach of confidence" claim under Grenadian or English common law. RSM's pleadings in the trial court set out similar elements to a misappropriation of trade secrets claim under Texas law. Accordingly, we analyze RSM's claims in that context.

defendant" or any reliance on the trade secret to assist or accelerate research or development. *Sw. Energy Prod. Co. v. Berry-Hefland*, 491 S.W.3d 699, 722 (Tex. 2016); *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450–51 (5th Cir. 2007).

Here, RSM alleged that Global "knowingly committed a tort in Texas against RSM, a Texas Corporation," by misappropriating RSM's 2D seismic data and using it to develop Grenadian offshore reserves pursuant to Global's agreement with the Grenadian government. RSM alleged that Global obtained the data from either BPX or TNK-BP, neither of which are Texas companies or are alleged to have done any business in Texas. RSM did not allege any facts or adduce any evidence indicating that Global acquired its 2D seismic data in Texas. In fact, Global's unrebutted jurisdictional evidence established that Global obtained the 2D seismic data from the Grenadian government in Grenada. Thus, to the extent that Global may have committed a tort in acquiring the data in question, there are no pleadings or evidence demonstrating that this act occurred, even in part, in Texas. *See Kelly*, 301 S.W.3d at 660–61; *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) ("For a court to exercise specific jurisdiction over a nonresident defendant, . . . the cause of action must arise from or relate to [purposeful] contacts [with the forum state].").

In response to Global's special appearance, RSM made additional allegations that the subject matter of Global's contractual relationships with the Houston-based entities required the dissemination and use of RSM's proprietary data, and it asserted that the substance of Global's contracts—such as indemnity, consent-to-jurisdiction, and choice-of-law provisions—constituted contacts with Texas that were connected to Global's disclosure and use of RSM's data. Finally, RSM asserted that Global used RSM's proprietary data on numerous trips to Texas and through other communications such as phone calls and emails directed to Texas. RSM identified Tricon, INEXS, SeaBird, Blackwater, and GX Technology as companies that are either "Texas entities or had major offices in the State" and with whom Global contracted in connection with its development of the Grenadian reserves.

### 1. Global's contacts through Tricon and INEXS

Regarding the relationship among Global, Tricon, and INEXS, RSM asserts that Global provided Tricon and INEXS with data that included RSM's seismic data and that "emails between Global representatives and the Texas entities expressly reference [RSM's] Seismic Data" as being located in Houston at some point prior to RSM's filing of the underlying suit in December 2013. RSM alleges that Global brought "paper sections of the Seismic Data to Houston and removed them after the lawsuit was filed." It asserts that Global provided to Tricon a chart

19

that "designated 'RSM' lines from 1970" and several seismic maps with the designation "RSM Production Corporation" and provided copies of these documents during jurisdictional discovery.

Global does not dispute that it provided 2D seismic data to Tricon representatives. However, its jurisdictional evidence indicates that it provided the data to Tricon in Grenada and Venezuela for Tricon's use in Venezuela. Thus, assuming that this use was unlawful, it does not constitute an act connected to RSM's claims that "occurred, at least in part, in Texas." *See Kelly*, 301 S.W.3d at 660–61.

Global likewise does not dispute that INEXS possessed some of the allegedly misappropriated 2D seismic data and used it in Houston. However, Global provided evidence that Tricon gave the data in question to INEXS as part of the subcontractor agreement between Tricon and INEXS. Global also presented evidence, in the form of Ward's declaration and Angeli's deposition testimony, that INEXS possessed but ultimately never used the allegedly misappropriated 2D seismic data. Angeli stated that the vintage 2D data was only of "very limited" use and that it was only used "[i]n a way . . . because it was integrated into the whole picture." Tricon and INEXS then provided Global with a report generated from the 2D seismic data that included some limited use of the vintage 2D data from the

Grenadian government (part of which was RSM's allegedly proprietary data) and data sets from at least two other sources.

Global's dealings with Tricon and INEXS do not constitute evidence of Global's "actions and choices to enter the forum state and conduct business" in connection with RSM's claims as required to establish specific jurisdiction over it. *See id.* at 660; *see also Michiana*, 168 S.W.3d at 785 (holding that only nonresident defendant's contacts with forum are relevant and that defendant should not be called to court solely as result of another party's or third person's unilateral activity); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.— Houston [14th Dist.] 2009, no pet.) ("When there are multiple defendants, the contacts of each defendant must be analyzed individually.") (citing *Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, (1984)). Rather, Global's activities as they relate to Tricon and INEXS demonstrate that Global did not direct any activities toward Houston; rather, it directed its activities toward Grenada and Venezuela. The fact that Tricon sent the disputed data to INEXS in Houston was not an action of Global, and the contact this created with Texas was merely fortuitous as to Global.

### 2. *Global's contacts through other Texas entities*

RSM further argues that Global entered into additional contracts with GX Technology, SeaBird/Oreo, and Blackwater "related to the commercial use of the

seismic data at issue"—including attending personal meetings, phone calls, and emails sent pursuant to those contracts—that constitute contacts with Texas related to RSM's claim for misappropriation of trade secrets. However, the jurisdictional evidence adduced by the parties indicates that none of the other contracts identified by RSM were substantially related to the alleged misappropriation of RSM's data.

Global contracted with GX Technology to obtain a license to use 2D seismic data from a third-party source. Angeli testified at his deposition that Global sought out additional sources of data because the vintage 2D data from the Grenadian government—the data set that included RSM's data—was insufficient for Global's purposes. Global's contract with Oreo, a foreign subsidiary of SeaBird, involved the collection of new 3D seismic data from the Grenada offshore sedimentary basin. And Global's contract with Blackwater involved Blackwater creating a development plan and providing project management for the initial drilling phase of the Grenada project scheduled to begin in 2014. Global adduced jurisdictional evidence that the work done by these companies was for the purposes of developing oil and natural gas reserves in Grenada and that it never provided any of RSM's data directly to these companies.

In response, RSM argues that Global used RSM's allegedly proprietary data in connection with its business with these three entities because Global used and discussed Tricon's report in determining what additional 2D and 3D data was

22

necessary and in creating a development plan. RSM asserts that its 2D data formed the basis of Tricon's report and, thus, any subsequent use of the report constituted use of RSM's trade secrets. The only jurisdictional evidence supporting RSM's allegation that Tricon's report was based on RSM's 2D seismic data is the evidence that some of RSM's data was included in the vintage 2D data obtained from the Grenadian government and that at least some of this data was examined by Tricon and INEXS. However, both Ward, with INEXS, and Angeli, with Global, testified that although RSM's data was to some extent "integrated into the whole picture," its data was not used in the report created by Tricon and INEXS. Rather, Angeli's deposition testimony indicates that RSM's data constituted only a portion of the vintage 2D seismic data that Global obtained from the Grenadian government, that Global procured additional sets of 2D data from other sources, and that Global procured its own 3D data to further its interests in developing the Grenadian offshore gas deposits. Angeli declared that "[n]one of the other entities who worked with [Global] in its exploration efforts—including defendants Blackwater and SeaBird—ever had access to or received [RSM's allegedly proprietary] information."

We conclude, in light of Global's jurisdictional challenge, that RSM has failed to provide adequate evidence supporting its claim that Global's contracts with GX Technology, Oreo/SeaBird, and Blackwater were substantially related to

RSM's claim against Global for misappropriation of its trade secrets. *See Kelly*, 301 S.W.3d at 658–60 (holding that defendant can negate jurisdiction on factual or legal basis and that plaintiff is required to "plead and, when challenged by the defendants, present evidence" that defendant's relevant acts connected to plaintiff's claims "occurred, at least in part, in Texas"); *Moki Mac*, 221 S.W.3d at 585 ("[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation."). As alleged by RSM, Global's use of the allegedly proprietary data in its dealings with GX Technologies, Oreo/SeaBird, and Blackwater—i.e. that Global used a report created by companies that, at one point, had had access to RSM's proprietary data along with multiple other sources of data—was entirely incidental to Global's efforts to develop its interests in the Grenadian oil and gas reserves.

RSM argues that this Court should not consider Global's assertion that it did not commit a tort in Texas because RSM's data was unusable because this is an argument going to the merits, and such an argument is improper at the special appearance phase of litigation. *See Michiana*, 168 S.W.3d at 790–91. However, RSM's assertion that Global is subject to specific jurisdiction here in Texas is based on its assertion that Global disclosed and otherwise used the data in Houston. Global's special appearance challenging this assertion places the issues

of where Global's use of the data occurred and how that alleged use related to Global's Texas contacts squarely before both the trial court and this Court. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

We likewise reject RSM's arguments that Global's contracts with Texas entities—contracts containing choice of law, submission to jurisdiction, and indemnification provisions—serve as contacts arising from the alleged misappropriation of trade secrets claim that could support a finding of specific jurisdiction. In an analysis of specific jurisdiction, we do not look to all of Global's activities in Texas, but only to its activities that give rise to RSM's cause of action. *See Kelly*, 301 S.W.3d at 658–60. Global's contracts with GX Technology, Tricon, Oreo/SeaBird, and Blackwater contain provisions that are applicable to disputes arising under those particular contracts. None of them provide a general waiver of Global's right to challenge personal jurisdiction in this case.

RSM argues that "choice-of-law provisions should not be ignored in considering whether a defendant has purposefully invoked the benefits and protections of a State's laws," citing *Michiana* and *Burger King*. *See Michiana*, 168 S.W.3d at 778; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482, 105 S. Ct.

25

2174, 2187 (1985). While the Supreme Court in *Burger King* held that courts should consider a choice-of-law provision in analyzing personal jurisdiction, it also held that "such a provision standing alone would be insufficient to confer jurisdiction." *Burger King*, 471 U.S. at 482, 105 S. Ct. at 2187. It considered that the contract provision in that case, "when combined with the 20-year interdependent relationship [the defendant] established with Burger King's Miami headquarters, . . . reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* Thus, the dispute in *Burger King* arose out of and was related to the franchise agreement that contained the choice-of-law provision and the resulting business relationship between the plaintiff and defendant. *See id.*

In contrast, RSM's claims here do not arise out of Global's contracts with these various Texas entities, and RSM cites no cases in which a court has found specific jurisdiction based on choice-of-law or indemnification provisions in contracts that are unrelated to the plaintiff's claims. *See also KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., LLP*, 384 S.W.3d 389, 394 (Tex. App.—Dallas 2012, no pet.) (holding that defendant did not "seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" when its "'availing' was for the purpose of building its restaurants in Kansas, not for reaping a profit or obtaining a benefit or advantage in Texas").

In its appellate brief, RSM cites *Moncrief Oil* as a case in which the Texas Supreme Court held "that specific jurisdiction existed over a defendant who willingly attended a meeting in Texas where trade secrets were exchanged." *See Moncrief Oil*, 414 S.W.3d at 153. However, RSM has not provided sufficient evidence, in light of Global's challenge to its jurisdictional facts, that Global attended any meeting in Texas in which trade secrets were exchanged. Global asserted that it provided the allegedly misappropriated seismic data to Tricon representatives in Grenada and Venezuela. Tricon provided the data in question to a third party in Houston, and, after this lawsuit was filed, a Global representative gathered all seismic data regarding the Grenada development and returned it to the Grenadian government.

RSM also relies on *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 453 S.W.3d 492 (Tex. App.—Houston [14th Dist.] 2014, pet. filed), to support its contention that Global's in-state visits establish specific jurisdiction here. In *M&F Worldwide Corp.*, the Fourteenth Court of Appeals held that two in-state visits by the defendants were "dispositive" of the issue of whether they purposely availed themselves of the forum because it was at those meetings that defendants developed a plan to escape indemnity obligations to the plaintiff, Pepsi, that formed the basis of Pepsi's lawsuit. *Id.* at 505–06. Here, however, there is no

indication that Global attended any meetings in Texas in connection with its alleged misappropriation of the 2D seismic data.

At oral argument, RSM also relied on two recently published Texas Supreme Court cases, *Searcy v. Parex Resources, Inc.*, —S.W.3d—, No. 14-0293, 14-0295, 2016 WL 3418248 (Tex. June 17, 2016), and *Cornerstone Healthcare Group Holding, Inc. v. Nautic Management VI, L.P.*, 493 S.W.3d 65 (Tex. 2016), to support its contention that Global's Texas contacts were the crux of its complaint. RSM's reliance on these cases is unavailing.

In *Parex*, the supreme court addressed whether a Texas court could exercise specific jurisdiction over three companies: Parex Canada, Parex Bermuda, and Ramshorn. Another company, Nabors Industries (a Bermudian company with operations in Houston), through a subsidiary, was the sole shareholder of Ramshorn (a Bermudian company), which owned a Columbian oil and gas operation. 2016 WL 3418248, at *1–2. Nabors sought a purchaser for its shares and the plaintiff, ERG (a company based in Houston), attempted to purchase the shares. *Id.* at *2–4. When ERG's purchase of the shares fell through, Nabors sought out other purchasers, and, after a series of negotiations, Parex Canada (a Canadian company), acting through its newly created entity Parex Bermuda (a Bermudian company) agreed to purchase the shares from Ramshorn's subsidiary. *Id.* at *3–4. ERG then filed suit in Texas seeking specific performance of its share

purchase agreement with Nabors, alleging tortious interference with contract against Nabors, Parex Canada, and Parex Bermuda, and alleging fraud against Ramshorn. *Id.* at *4.

The supreme court held that Texas courts could not exercise specific jurisdiction over Parex Canada. *Id.* Although Parex Canada negotiated the purchase of shares of Ramshorn's Colombian oil and gas assets owned by Nabors in Houston and it knew that Nabors had operations in Texas, Parex Canada "did not specifically seek out a Texas seller or Texas assets, let alone attempt[] to meddle with a contract governed by Texas law or develop a Texas business." *Id.* at *9. Parex Canada did not "seek to launch operations in Texas or reap the benefits of the Texas economy," but was "on the hunt for Colombian assets." *Id.* at 10. The fact that Parex Canada negotiated in Houston was insufficient, because Nabors "could, quite literally, have been based anywhere in the world, and Parex Canada would presumably have interacted with it in the same way." *Id.* at *11. Further, the fact that Nabors had negotiated the sale of its stock with ERG, a Texas corporation, made no difference: "Nabors' unilateral decision to enter into [that] agreement was completely out of Parex Canada's control." *Id.* at *10.

By contrast, the supreme court found that Texas courts could properly exercise specific jurisdiction over Ramshorn, the Bermudian owner of the Columbian oil and gas operation, because ERG's claims against Ramshorn turned

on Ramshorn's Texas-based executives' alleged misrepresentations in Texas to a Texas entity. *Id.* at *12–13. Nabors, the sole owner of Ramshorn, shared officers with Ramshorn and directed Ramshorn's actions from Houston. *Id.* at *12. An executive of both Nabors and Ramshorn acted as Ramshorn's president, "and in doing so made fraudulent representations in Houston about the Ramshorn assets that he was trying to sell to ERG." *Id.* The supreme court concluded that the trial court had specific jurisdiction based on Ramshorn's president's purposeful availment of Texas "by negotiating at relative length in Texas for sale of its shares to a Texas buyer" and because "ERG's claims directly arise out of this contact with the Texas forum, because they allege that Ramshorn made various misrepresentations during these Texas dealings." *Id.* at *13

RSM compares Global to Ramshorn. We disagree. As discussed above, Global's alleged dissemination and use of RSM's allegedly proprietary data occurred in the context of its relationship with Tricon, and through Tricon, INEXS. Global did not direct the actions of Tricon when Tricon entered into the subcontractor agreement with INEXS and sent or used RSM's alleged trade secrets in Houston. And Global did not use the alleged trade secrets in its business with GX Technologies, Oreo/SeaBird, or Blackwater. Thus, unlike Ramshorn, Global did not engage in any of the allegedly tortious conduct in Texas. Furthermore, Ramshorn's negotiations in Texas were made with the plaintiff, ERG. Here, by

30

contrast, there was no relationship between Global and RSM prior to these legal proceedings. While Global did negotiate and meet with some companies in Texas, those negotiations, meetings, and contracts involved Global's efforts to develop its interest in the Grenadian offshore oil and gas reserves, not the procurement or use of RSM's alleged trade secrets.

Global's contacts are likewise distinguishable from those of the defendants in *Cornerstone*, the other case relied upon by RSM. In *Cornerstone*, the plaintiff accused the defendants—including its former executives—of "utilizing [the plaintiff's] proprietary and confidential information to usurp a corporate opportunity for their own . . . benefit" and subsequently acquiring a hospital system by relying on these trade secrets. 493 S.W.3d at 69. The supreme court held that the court properly exercised jurisdiction over the defendants because the deal "did not stem from a third party's unilateral activity; it was the result of a transaction stemming from the activity of the respondents themselves." *Id.* at 73. They "targeted Texas assets in which to invest and sought to profit from that investment." *Id.* The Court held that because "the facts surrounding the . . . transaction—which is the crux of the respondents' purposeful contact with Texas—will be the focus of the claims against the respondents at trial . . . those claims arise out of the respondents' Texas contacts." *Id.* at 74. By contrast, here, the processing of allegedly misappropriated data in Texas stemmed from a third

31

party's (Tricon) unilateral activity. Global did not target Texas assets in which to invest and did not seek to profit from any investment in Texas.

RSM has not provided sufficient evidence, in response to Global's challenge to its jurisdictional facts, that Global attended any meeting prior to this litigation in Texas in which RSM's trade secrets were exchanged or even that Global directly caused the trade secrets to be present or discussed in Texas. In contrast to the use of the trade secrets in *Cornerstone*, there is no allegation that Global relied on the information in procuring its development deal with the Grenadian government; rather, the evidence indicates that Global received the information as a result of that deal. Global sought out a Coloradan corporation in Venezuela to process data, and that company then sought out a Texas company to render a service analyzing the allegedly misappropriated trade secrets, which concerned seismic data from offshore Grenada. At no point did Global specifically seek out a Texas company or Texas assets in relation to the allegedly misappropriated trade secrets in order to profit from the Texas economy. Therefore, the facts surrounding the misappropriation of trade secrets are *not* the crux of Global's purposeful contacts with Texas.

We hold that the similarities between Parex Canada's and Global's contacts are far more compelling. Global contacted Tricon in Venezuela, and through Tricon, was introduced to various Houston contractors who could carry out tasks in

32

Grenada. Global sought contractors to provide services to enable it to exploit its Grenadian assets. The Tricon and INEXS employees could, quite literally, have been based anywhere in the world (and in fact were—Tricon had offices in Colorado and Venezuela along with Houston) and Global would presumably have interacted with the two in the same way. *See Parex*, 2016 WL 3418248, at *11. Global did not specifically seek a Texas contractor in connection with its use or misuse of RSM's allegedly proprietary data, and it did not initiate the interactions that it eventually had with INEXS. Further, Tricon—not Global—initially hired INEXS, a Texas company, as a subcontractor, and Tricon's unilateral decision to enter into that subcontracting agreement was completely out of Global's control. *See id.* at *9–10.

Under these facts, the trial court could have reasonably found that Global did not purposely seek benefits of Texas's jurisdiction from which its alleged liability for misappropriation of trade secrets arises. Global's actions giving rise to RSM's misappropriation of trade secrets claim were conducted in Grenada and Venezuela. There was no substantial relationship between those actions and Texas. Global's contacts with Texas, such as its meetings and contracts with GX Technologies and others, were held to conduct other business related to the development of its interest in Grenadian offshore oil and gas deposits, not to discuss trade secrets.

We conclude that RSM has not alleged or presented evidence of any Texas activity by Global out of which its claim for misappropriation of trade secrets against Global arises. Thus, the trial court properly found that it could not exercise specific jurisdiction over Global. *See Kelly*, 301 S.W.3d at 658.

## Conclusion

We affirm the trial court's interlocutory order sustaining Global's special appearance.


Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Huddle.