Jane Bland, Justice
A jury found that Eagle Oil & Gas Co. misappropriated a competitor's trade secret information, and it awarded that competitor $14,300,000 in lost profits and $4,500,000 in exemplary damages. The trial court entered judgment on the jury's verdict. Eagle appeals, challenging the judgment as legally barred by res judicata and the economic loss rule. It also challenges the sufficiency of the evidence to support liability for misappropriation of trade secrets, the reliability of the expert testimony supporting the award of lost profits, the construction of the court's charge, and the award of exemplary damages. We conclude that the evidence does not support a finding of malice, and therefore we reverse the award of exemplary damages. We affirm the remainder of the judgment.
*264 BACKGROUND
The Prospect
In 2011, three companies partnered to develop an oil and gas prospect in Daniels County, Montana. The three companies were:
(1) Orion Resources, Inc., led by its owner, John Bumgardner. Orion was responsible for developing geological data;
(2) Black Pearl Exploration, LLC, led by its president, Mike Looney. Black Pearl was responsible for marketing the prospect; and
(3) Shale Exploration, LLC, led by its president, Sam Tallis. Shale was responsible for acquiring mineral rights within the prospect.
Shale Exploration obtained the judgment against Eagle under review in this appeal.
Each of the companies played a role in formulating the Daniels County prospect. Orion researched the geology, Black Pearl focused on locating investors, and Shale researched the ownership of the targeted mineral interests.
Daniels County is in a rural part of Montana. Its northern boundary is the U.S.-Canadian border. The county has a population of about 1,300, but ownership of the mineral interests in the county is highly fractionalized and often does not coincide with ownership of the surface rights. As a result, tens of thousands own mineral rights in the prospect. Most of these owners do not live in the county. Their identities are ascertainable only through title research, which had to be done manually at the county courthouse, as the ownership records were not available online. It took Shale months to complete its research, which it then used to locate and negotiate oil and gas leases with the mineral owners. Shale negotiated these leases in its name. The ultimate goal was to attract a business partner that would drill for oil or gas.
Discussions with Eagle
Black Pearl identified Eagle Oil & Gas Co., an exploration and drilling company, as a possible development partner. Eagle's intermediary, Wynn Purifoy of Cibolo Capital, told Black Pearl that Eagle was interested in learning about the prospect. Eagle and Black Pearl negotiated a confidentiality and non-competition agreement to protect the prospect-related information that would be shared with Eagle. Trevor Hull, an employee of Black Pearl, and Brad Ayres, an employee of Eagle, coordinated these negotiations. Purifoy acted as an intermediary between Ayres's and Hull's communications. Though no party produced a copy of a confidentiality agreement executed by Eagle, two witnesses testified that Eagle had executed the final version sent for its signature.
The written confidentiality agreement does not include Shale as a party or a signatory. Rather, Orion was the counterparty. At the time, Shale was a wholly owned subsidiary of Orion.
During a November 2011 teleconference, Bumgardner presented Orion's geological information about the prospect to Eagle. Bill Fairhurst, a vice president of Eagle, participated in this teleconference, among others. In a face-to-face meeting in December, Sam Tallis discussed Shale's work with Eagle in a two- to three-hour presentation. Pat Bolin, Eagle's chief executive officer, attended the Tallis presentation with Fairhurst. Sid Greehey, a significant investor in Black Pearl, also participated. The presentation disclosed Shale's research and its plan to secure the required mineral leases in the prospect. Tallis revealed the areas within Daniels County that Shale already had leased and those that Shale had targeted as priorities. The presentation included a map of the prospect *265 with Shale's plan notated on it. The map identified three distinct areas of interest and the anticipated value that Shale placed on each area. Tallis described this map as a "treasure map," because it identified the land where mineral leases had yet to be secured but were components of any eventual drilling play. The information also included a lease schedule, and additional maps that distinguished between the land where Shale had negotiated mineral leases from the land not yet leased. Shale left a box of the written materials with Eagle after the December meeting.
After the December meeting, Eagle continued to express interest in the prospect. The parties continued their discussions and exchange of information. Two months later, Eagle was still analyzing the prospect's potential merit, about which it was optimistic.
Eagle is Denied a Deal
But the parties never reached a development deal. In March 2012, Orion, Black Pearl, and Shale instead reached an agreement with the Apache Corporation to develop the prospect. Shale and Orion also divested from one another, with Shale becoming an independent company. In the Apache agreement, Shale promised to acquire leases covering at least 300,000 acres in Daniels County to resell to Apache. Apache in turn promised to purchase the leases from Shale at $800 per acre. When the Apache deal was signed, Shale already had acquired about 120,000 to 150,000 of these 300,000 acres. Shale was obligated to hit its 300,000 target within six months; otherwise, Apache could walk away from the deal.
Eagle Targets the Leases
As Shale continued to secure leases, it began to see competition for its target leases, which jeopardized its deal with Apache. Shale learned that a competing purchaser of mineral leases, called Montana Lease Holdings, had been formed in mid-March by John Gentry. Montana Lease assigned all of the leases that it had acquired-about 11,000 of them-to Eagle Wes-Tex, L.P., a wholly owned subsidiary of Eagle.
The assignment to Eagle Wes-Tex was in place from the beginning. Within days of forming Montana Lease, Gentry signed a lease-purchase agreement with Eagle Wes-Tex. Under the agreement, the leases were assigned to Eagle Wes-Tex. Eagle, however, was the company that paid Montana Lease for the leases upon their assignment to Eagle Wes-Tex.
Sam Tallis of Shale learned from George Lucker, an agent with Montana Lease, that Montana Lease had been acquiring leases in Daniels County to later assign them to Eagle. Lucker showed Tallis a map that he was using to identify lease prospects for Eagle. It was a copy of Shale's map of the prospect that had been shared with Eagle at the December presentation.
Shale Sues Eagle
Shale acquired well over 300,000 acres of mineral leases, and the deal with Apache closed. Apache paid Shale $800 per leased acre to secure development rights in the prospect that had been shared with Eagle at the December presentation.
Shale sued Eagle by intervening in a lawsuit brought against Eagle by Orion and Black Pearl. Shale claimed that Eagle had breached the confidentiality agreement and had engaged in a theft of trade secrets. Eagle Wes-Tex was also joined as a defendant. Eagle Wes-Tex counterclaimed. It alleged that Orion, Black Pearl, and Shale had tortiously interfered with its legitimate business endeavors within Daniels County.
Orion and Black Pearl settled with Eagle and Eagle Wes-Tex. Orion and Black *266 Pearl then nonsuited their claims against Eagle and Eagle Wes-Tex. Shale was not a party to the settlement.
The case proceeded to trial with Shale as the remaining plaintiff. At trial, Shale claimed that Eagle had breached the confidentiality agreement and had misappropriated its trade secrets. As damages, Shale claimed lost profits attributable to (1) leases that it would have acquired but for Eagle's conduct; and (2) increased leasing costs resulting from Eagle's wrongful competition. Both resulted in a lower net profit from the deal with Apache.
Eagle disputed that any confidentiality agreement existed, and it noted that Shale was not a party to that agreement even if it had been executed. Eagle also disputed that it had agreed to hold any of Shale's information in confidence, or that it had misappropriated any confidential information imparted to it.
The jury found for Shale on both of its claims, and it rejected Eagle Wes-Tex's counterclaims. It awarded Shale $14,300,000 in lost profits, composed of (1) $4,000,000 attributable to the leases that Eagle acquired that Shale otherwise could have acquired and then resold to Apache; and (2) $10,300,000 representing the increased cost of acquiring leases due to Eagle's competition. It also found that Eagle acted with malice and awarded $4,500,000 in exemplary damages. The trial court entered judgment on the jury's misappropriation of trade secrets findings and ruled that Eagle Wes-Tex take nothing on its counterclaims.
DISCUSSION
Eagle and Eagle Wes-Tex contend that Orion's nonsuit is res judicata as to Shale's claims, and thus, the nonsuit legally bars the judgment. Alternatively, they argue, the judgment is barred by the economic loss rule. They further contend that the evidence is legally and factually insufficient to support the jury's findings, including its findings that Eagle misappropriated trade secrets from Shale and acted with malice. They further contend that Shale's expert testimony on lost profits was unreliable and constitutes no evidence of damages, or else that this testimony should have been excluded as a sanction for discovery abuse. They contend that defects in the jury charge, including the commingling of valid and invalid theories of recovery, preclude entry of judgment on the verdict. Finally, Eagle Wes-Tex contends that the evidence is insufficient to support the jury's adverse findings on its counterclaims. We address these contentions in turn.
I. Res Judicata
Eagle contends that Orion's earlier nonsuit bars Shale's claims against Eagle because Shale was in privity with Orion. At the time Eagle and Shale engaged in development discussions, Shale was a wholly owned subsidiary of Orion, but Shale was divested from Orion in March 2012, well before Shale intervened in this lawsuit and before Orion settled with Eagle.
A. Applicable law
To successfully assert the affirmative defense of res judicata, a party must prove: (1) a court of competent jurisdiction entered a final judgment on the merits between the same parties or their privies in an earlier lawsuit; and (2) the current lawsuit is based on claims that were or could have been raised in the earlier one. Travelers Ins. Co. v. Joachim , 315 S.W.3d 860, 862 (Tex. 2010). When applicable, res judicata bars the second, subsequent suit. Id. ; see Genender v. Kirkwood , 506 S.W.3d 508, 513 (Tex. App.-Houston [1st Dist.] 2016, no pet.).
*267 The filing of a plea in intervention does not result in a separate legal proceeding. See City of Houston v. Bryant , 516 S.W.3d 47, 56 (Tex. App.-Houston [1st Dist.] 2017, pet. denied). The right to intervene is intended to prevent multiple suits concerning the same subject, and to resolve competing claims in the same proceeding. See Walker v. Garland , 235 S.W. 1078, 1079 (Tex.Com.App. 1922) ; Inter-Cont'l Corp. v. Moody , 411 S.W.2d 578, 589 (Tex. Civ. App.-Houston 1966, writ ref'd n.r.e.).
When, as here, the material facts are not disputed, the applicability of res judicata presents a question of law, which we review de novo. See Kenneco Energy v. Johnson & Higgins of Tex. , 921 S.W.2d 254, 259 (Tex. App.-Houston [1st Dist.] 1995), judgm't modified on other grounds , 962 S.W.2d 507 (Tex. 1998) ; accord Stephens v. LPP Mortg. , 316 S.W.3d 742, 746 (Tex. App.-Austin 2010, pet. denied).
B. Analysis
Shale intervened in Orion and Black Pearl's pending suit against Eagle. It did not file a separate proceeding against Eagle. Res judicata thus is inapplicable, because Shale did not assert its claims in a second, subsequent suit to which the defense could apply; it intervened in an existing suit to assert its own interests in the underlying dispute.
Even if the defense applied in this context, Shale was not in privity with Orion for the purposes of res judicata. Parties are privies if they represent the same legal right in litigation. Better Bus. Bureau of Metro. Houston v. John Moore Servs. , 500 S.W.3d 26, 41 (Tex. App.-Houston [1st Dist.] 2016, pet. denied) (relying on Benson v. Wanda Petrol. Co. , 468 S.W.2d 361, 363 (Tex. 1971) ). This identity of interest exists when a party in a subsequent suit controlled or could have controlled the earlier suit, despite not being a party to it, or its interest was represented in the earlier suit, or it is a successor in interest to a party in the earlier suit. Id.
Eagle does not contend that Shale controlled or could have controlled Orion's suit and settlement, nor that Shale was Orion's successor in interest. Instead, Eagle premises privity on Shale's status as Orion's wholly-owned subsidiary at the time the misappropriation occurred. Shale ceased being a subsidiary of Orion more than two years before Orion settled with Eagle and nonsuited its claims.
Orion bought Shale in October 2011. Shale was wholly owned by Orion during the period in which Orion, Black Pearl, and Shale shared information on the prospect with Eagle. The principals of the three companies became embroiled in a business dispute. As part of the settlement of this dispute, Shale was divested from Orion and conveyed back to Tallis in March 2012. The divestment predates Orion's filing of this lawsuit and its settlement and nonsuit of its claims against Eagle.
Shale and Orion did not have aligned legal interests, or any affiliation, when Orion sued Eagle, or afterward when Orion settled its claims against Eagle. Eagle asserts that Shale is in privity with Orion because Shale adopted Orion's allegations by reference. But the fact that Shale sought to prove the same facts is not enough to show privity between parties asserting distinct legal rights. Samuel v. Fed. Home Loan Mortg. Corp. , 434 S.W.3d 230, 235 (Tex. App.-Houston [1st Dist.] 2014, no pet.).
In sum, Orion did not assert Shale's legal rights against Eagle in this or an earlier separate proceeding. Accordingly, we hold that res judicata does not bar Shale's claims.
*268 II. Economic Loss Rule
Eagle contends that the economic loss rule bars Shale's claim for misappropriation of trade secrets because it is based on a confidentiality agreement and thus is cognizable only in contract.
A. Applicable law
Whether the economic loss rule bars a tort claim presents a question of law, which we review de novo. James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce , 403 S.W.3d 360, 365 (Tex. App.-Houston [1st Dist.] 2013, no pet.).
The economic loss rule bars a recovery in tort for economic losses caused by a breach of contract, if the losses are due to the failure to fulfill a contractual obligation. Chapman Custom Homes, Inc. v. Dallas Plumbing Co. , 445 S.W.3d 716, 718 (Tex. 2014) (per curiam); Med. City Dallas v. Carlisle Corp. , 251 S.W.3d 55, 61 (Tex. 2008). This rule has been applied to unintentional torts, including negligence and strict liability claims. LAN/STV v. Martin K. Eby Constr. Co. , 435 S.W.3d 234, 235, 238 (Tex. 2014) ; Sharyland Water Supply Corp. v. City of Alton , 354 S.W.3d 407, 418 (Tex. 2011).
But economic losses are recoverable under a variety of intentional tort theories absent a contractual obligation. See Sharyland , 354 S.W.3d at 418-19. Even if the matter in dispute is the subject of a contract, a party may elect a recovery in tort if the duty breached stands independent from the contractual undertaking, and the alleged damages are not solely the result of a bargained-for contractual benefit. Chapman , 445 S.W.3d at 718 ; e.g. , Peterson Grp. v. PLTQ Lotus Grp. , 417 S.W.3d 46, 62-63 (Tex. App.-Houston [1st Dist.] 2013, pet. denied) (economic loss rule did not bar intentional fraud claim because duty to not defraud was independent from obligation to perform contract). Thus, to decide whether the economic loss rule bars Shale's claim for misappropriation of trade secrets, we consider the source of Eagle's alleged duty and the remedy Shale sought. See James J. Flanagan , 403 S.W.3d at 365.
B. Analysis
Shale sought to recover lost profits under two theories, breach of the confidentiality agreement and misappropriation of trade secrets. It alleged that it had an enforceable confidentiality agreement with Eagle and that Eagle breached it. Shale further alleged that Eagle misappropriated trade secrets in violation of either a confidential or a contractual relationship.
The breach of a confidential relationship is an essential element of a misappropriation claim. See RSM Prod. Corp. v. Global Petrol. Grp. , 507 S.W.3d 383, 393 (Tex. App.-Houston [1st Dist.] 2016, pet. denied). Though the breach of a confidential relationship may be a breach of contract, and result in contractual liability, a breach of confidence also gives rise to an independent claim for misappropriation of trade secrets, regardless of contractual liability. RESTATEMENT (FIRST) OF TORTS § 757 cmt. j (1939); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. a (1995). Thus, the duty not to breach confidences by unauthorized use to gain a profit stands independently from a party's contractual obligations, even when the contract requires confidentiality. See Sw. Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 704-05 (Tex. 2016) (reversing and remanding for new trial on both contract and common law misappropriation claims in case involving alleged breach of oil-and-gas confidentiality agreement).
With respect to the available remedy, lost profits are recoverable both for a *269 breach of contract and for common-law misappropriation of trade secrets. Id. at 710-11 (damages in misappropriation cases can be "value of the plaintiff's lost profits"); ERI Consulting Eng'rs v. Swinnea , 318 S.W.3d 867, 876 n.3 (Tex. 2010) (damages for tort and contract claims may include lost profits). Because these economic losses may be pleaded and proved in connection with a misappropriation claim and do not arise solely from a contractual duty, the remedy that Shale recovered does not implicate the economic loss rule.
In sum, Eagle's liability exists independent from a contractual obligation, if the evidence is sufficient to show the elements of the tort of misappropriation of trade secrets. Thus, we hold that the economic loss rule does not bar Shale's misappropriation claim. Instead, Shale had to choose its remedy between its tort and contract claims. See Sw. Bell Tel. Co. v. DeLanney , 809 S.W.2d 493, 494 (Tex. 1991).
Having rejected Eagle's legal challenges based on res judicata and the economic loss rule, we turn next to Eagle's challenges to the sufficiency of the evidence supporting the verdict.
III. Misappropriation of Trade Secrets
Eagle challenges the legal and factual sufficiency of the jury's verdict, contending that the evidence is insufficient to show (1) the existence of any trade secrets, (2) a confidential relationship, and (3) misappropriation. To establish liability for misappropriation of trade secrets, Shale had to prove that it disclosed a trade secret to Eagle, in confidence, and that Eagle breached this confidence and made unauthorized use of the secret. See RSM Prod. , 507 S.W.3d at 393.
A. Standard of review
In a legal sufficiency review, we consider the evidence in a light most favorable to the jury's findings, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. City of Keller v. Wilson , 168 S.W.3d 802, 827 (Tex. 2005) ; Repub. Petrol. v. Dynamic Offshore Res. , 474 S.W.3d 424, 433 (Tex. App.-Houston [1st Dist.] 2015, pet. denied). A party that challenges the legal sufficiency of a finding on which it did not have the burden of proof must show that no evidence supports the jury's finding. Exxon Corp. v. Emerald Oil & Gas Co. , 348 S.W.3d 194, 215 (Tex. 2011) ; Repub. Petrol. , 474 S.W.3d at 433. We defer to the jury's determination of the credibility of the witnesses and the weight to accord their testimony. City of Keller , 168 S.W.3d at 819 ; Repub. Petrol. , 474 S.W.3d at 433.
In a factual sufficiency review, we consider all of the evidence in the record in a neutral light and set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) ; Repub. Petrol. , 474 S.W.3d at 433. Jurors are entitled to resolve inconsistencies in witness testimony, whether those inconsistencies result from the contradictory accounts of multiple witnesses or from internal contradictions in the testimony of a single witness. McGalliard v. Kuhlmann , 722 S.W.2d 694, 697 (Tex. 1986) ; Repub. Petrol. , 474 S.W.3d at 433.
B. Existence of a trade secret
First, Eagle contends that Shale's identification and compilation of mineral interest owners within the prospect is derived from publicly available information and thus is not secret. Business compilations, however, can be trade secrets when the work done is not generally known or available. See *270 Computer Assocs. Int'l v. Altai, Inc. , 918 S.W.2d 453, 455 (Tex. 1996) ; T-N-T Motorsports v. Hennessey Motorsports , 965 S.W.2d 18, 22 (Tex. App.-Houston [1st Dist.] 1998, pet. dism'd). Eagle ignores the testimony that information about ownership of mineral interests in Daniels County was obscure and not easily obtained. A compilation of business information that provides a competitive advantage over those who lack the compilation may constitute a trade secret. Computer Assocs. , 918 S.W.2d at 455 ; INEOS Grp. v. Chevron Phillips Chem. Co. , 312 S.W.3d 843, 848 (Tex. App.-Houston [1st Dist.] 2009, no pet.). If the available information is practically obscure, expensive to gather, and requires special knowledge to compile and use for analysis, then the fact that it is derived from public records does not foreclose trade secret status; rather, it is a factor to consider. T-N-T Motorsports , 965 S.W.2d at 22-23 ; see also Bishop v. Miller , 412 S.W.3d 758, 769, 771 (Tex. App.-Houston [14th Dist.] 2013, no pet.) (noting that compilations of readily available information can amount to more than sum of their constituent parts and in combination constitute trade secret).
In deciding whether Shale's compilation of mineral interest owners qualified as a trade secret, the trial court instructed the jury to consider:
(1) the extent to which the information was known outside the business;
(2) the extent to which the information was known by those in the business;
(3) the measures that were taken to safeguard the information's secrecy;
(4) the availability of the information to the business and competitors;
(5) the amount of effort or money spent developing the information; and
(6) the degree of difficulty that properly acquiring or duplicating it entails.
See In re Bass , 113 S.W.3d 735, 739-40 (Tex. 2003) ; INEOS Grp. , 312 S.W.3d at 848-49.
Shale adduced evidence in support of its position for these factors. Bumgardner and Tallis testified that Tallis had shared confidential information about Shale's acquisition of leases with Eagle at the December 2011 meeting. That information included a map of the prospect. The map identified distinct areas of interest and the anticipated value that Shale placed on each area. Tallis described it as a "treasure map," because it identified the land where mineral leases had yet to be secured but were necessary components of the eventual drilling play. The information also included a lease schedule, as well as additional maps that distinguished between the land where Shale had negotiated mineral leases and the land Shale had not yet leased. Particularly sensitive lease terms, including anticipated royalty and bonus information, was omitted from the schedule. Tallis testified, however, that he had discussed this information with Eagle in going through the schedules with its representatives. He disclosed contact information for the mineral lease owners. According to Tallis, Shale left a box of written materials with Eagle after the December meeting.
Bumgardner, Tallis, and others testified that the information conveyed to Eagle took substantial time and effort to develop. Shale's research of the ownership of the mineral interests took months. It required an employee presence at the local county courthouse because the interests were highly fractionalized and severed from the surface acreage. The mineral owners numbered in the tens of thousands. Identifying the owners and negotiating leases was labor-intensive. At its peak, Shale had more *271 than 100 people working on this project. Its lease schedule represented almost a year of work. Shale compiled leasing information and entered it in a computer database with specialized software. Possessing the information in this format would enable a competitor to avoid the effort and expense that Shale had undertaken and quickly acquire leases in the county. Hull said that, by the end of the second meeting, Shale had given Eagle its "whole play book" with respect to the prospect.
Eagle contends that there was not an agreement to keep the information that was disclosed to it confidential, and that this factor points to the lack of any secret. The evidence at trial was disputed on this point. Tallis required any potential business partners to agree to keep information confidential before any information would be disclosed. Both Hull and Looney stated that Eagle had executed a confidentiality agreement before the November and December 2011 meetings. Bumgardner and Looney testified that Bumgardner expressly asked the November teleconference participants whether a confidentiality agreement had been signed, and he was assured that it had been done. Tallis and Greehey sought the same assurance before proceeding with the December meeting. Both testified that Bolin told them that an agreement was in place. Tallis testified that Shale relied on Eagle's representation of confidentiality and would not have proceeded without them. Shale gave access to this information only to those who agreed to keep it confidential.
Eagle's witnesses disputed Shale's contention that it kept its information secret. Ayres and Fairhurst testified that the parties never finalized a confidentiality agreement. Fairhurst "did not recall" discussion of confidentiality at the November or December meetings. Bolin testified that the existence of an agreement was not discussed at the December one. Fairhurst testified that the majority of information presented by Bumgardner in the November meeting was publicly available, and that none of the information conveyed by Tallis in the December meeting was proprietary. Fairhurst did not consider the follow-up information that Shale provided to be confidential or proprietary. In addition, Fairhurst did not recall receiving a box of written materials from Shale at the December meeting.
Fairhurst, however, conceded that some of the information Bumgardner presented in the November meeting was proprietary and valuable. He also agreed that the conclusions Bumgardner drew from publicly available information might not be publicly available. Fairhurst likewise agreed that Shale's lease schedule had a lot of detailed information and was proprietary. He acknowledged Eagle's receipt of a prospect map showing where Shale already had leases and where it was seeking leases. Bolin more generally conceded that geological and land-related information could be confidential. He took some notes of information he thought was useful during the December meeting.
None of Eagle's witnesses disputed the testimony of Shale's witnesses as to the time and effort required to develop the information presented at the meetings. Though the identities of the owners of the mineral interests within the prospect were ascertained from publicly available records, it was undisputed that the task of identifying them took many people months to accomplish; no one could duplicate this information without like effort. Leaving the identity of the mineral interest owners aside, Eagle's expert, John Hughett, agreed that contact information for mineral owners and information about lease terms would be considered confidential and proprietary in the oil and gas industry *272 until those leases were recorded. He agreed that the types of information Tallis claimed to have disclosed to Eagle are commonly understood to be confidential and proprietary in the industry.
Taken together, the testimony of Shale's witnesses was evidence that Shale had expended substantial resources developing information that competitors did not possess and could not easily replicate, and that it kept this information secret absent assurances of confidentiality. Accordingly, we hold that Shale adduced legally sufficient evidence that it owned trade secrets relating to the Daniels County prospect that it shared with Eagle. Viewing this evidence in a neutral light, the jury's implicit finding that there was a trade secret is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Cain , 709 S.W.2d at 176 ; Repub. Petrol. , 474 S.W.3d at 433. Accordingly, we hold that there was factually sufficient proof of the existence of a trade secret.
C. Confidential relationship
Second, Eagle contends that Shale shared its information about the prospect without an agreement that Eagle would keep it confidential and not misuse it. It observes that Shale was not a party to the written confidentiality agreement that it further claims was never executed.
A contract to hold a trade secret in confidence is unnecessary, however, so long as a confidential relationship existed. Hyde Corp. v. Huffines , 158 Tex. 566, 314 S.W.2d 763, 769-70 (1958) ; T-N-T Motorsports , 965 S.W.2d at 22. A confidential relationship may exist where one party discloses confidential information to another to assess a proposed business arrangement or transaction when the party receiving the information (1) expressly promised to keep it in confidence; or (2) received the information under circumstances that would justify the conclusion that the party knew or had reason to know that the disclosure was intended to be in confidence, and the disclosing party reasonably inferred that the receiving party had consented to keep the information confidential. See RESTATEMENT (FIRST) OF TORTS § 757 cmt. j; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 41 (1995).
Whether Eagle and Shale had entered into a confidentiality agreement was disputed at trial. Hull and Looney testified that Orion and Eagle agreed to the terms of a confidentiality agreement before the November 2011 meeting and that Purifoy signed the agreement on Eagle's behalf. Shale, however, was neither named nor otherwise identified as a party covered by the obligations that the agreement established.
The written agreement aside, multiple witnesses testified that Bumgardner and Tallis sought and received assurances from Eagle that it would hold Shale's information confidential. Shale received those assurances before presenting its information at the November and December 2011 meetings. The jury could have credited this evidence in concluding that Eagle had promised to keep Shale's information confidential in exchange for using the information to evaluate a proposed development deal.
Fairhurst and Bolin denied that Eagle had agreed to keep Shale's materials confidential, but both conceded that if an Eagle representative had stated on Eagle's behalf that a confidentiality agreement was signed, the recipient of this representation would have been entitled to rely on it. Given the testimony as to Eagle's express representations of confidentiality and Fairhurst's and Bolin's acknowledgement that a party would have relied on these representations, *273 the jury reasonably could have found that Eagle had agreed to hold Shale's information in confidence and use it solely for the purposes of evaluating the proposed development deal. Based on the evidence indicating that Eagle knew Shale's disclosures were intended to be kept confidential and that Shale reasonably understood Eagle as having consented to keep Shale's information in confidence, we hold that legally and factually sufficient evidence support the jury's finding that Eagle agreed to keep Shale's information in confidence.
D. Unauthorized use
Third, Eagle argues that there is no evidence that it misused Shale's information or that any of the information it used was derived from Shale. Eagle contends that it relied solely on publicly available information in Daniels County to obtain its drilling leases.
Actual and unauthorized use of trade secrets must be proved to prevail on a misappropriation claim. See Sw. Energy , 491 S.W.3d at 721 ; Atl. Richfield Co. v. Misty Prods. , 820 S.W.2d 414, 422 (Tex. App.-Houston [14th Dist.] 1991, writ denied). In the context of trade secret cases, "use" means commercial use for the purpose of profit, including use likely to injure the secret's owner, enrich the defendant, or aid the defendant in its own research and development. Sw. Energy , 491 S.W.3d at 722 ; RSM Prod. , 507 S.W.3d at 393.
Tallis testified that, in March 2012, someone began leasing mineral rights identified by Shale. According to Tallis, Hull, and Greehey, there had not been meaningful competition for these leases before that date. Shale's agents worked in the county courthouse from open to close during this period; they did not encounter anyone else engaged in the title work necessary to identify mineral rights owners. Tallis eventually learned from an agent of Montana Lease, George Lucker, that Lucker was acquiring leases to turn over to Eagle. Lucker showed Tallis a map that identified the leases Lucker was seeking to secure for Eagle. It was a copy of Shale's map of the prospect.
More than 11,000 leases acquired by Montana Lease were later assigned to Eagle Wes-Tex, which is wholly owned by Eagle. And, it was Eagle that paid Montana Lease to obtain them.
More than a scintilla of evidence shows that Eagle used Shale's confidential information without Shale's authorization to compete against Shale in the prospect. Accordingly, we hold that legally sufficient proof supports the jury's finding that Eagle made unauthorized use of Shale's trade secret.
As to factual sufficiency, Eagle again disputed Shale's version of events. Lucker testified that Gentry, Montana Lease's owner, did not direct him to acquire leases in a particular area of Daniels County. Lucker did not know at the time for whom Montana Lease was acquiring these leases; he knew only that it was not Shale. Lucker denied that he had shown Tallis a map of Shale's prospect or that he used Shale's map to acquire leases.
Fairhurst testified that Eagle had been interested in Daniels County even before Eagle heard Bumgardner's and Tallis's presentations. Eagle had wells in an adjacent county. It previously had looked at proposals in Daniels County. At least six companies had come to Eagle with projects in Daniels County in late 2011 and early 2012. Montana Lease was one of these companies; it approached Eagle about the possibility of acquiring mineral leases in Daniels County, and Eagle entered an agreement to purchase the leases it acquired.
*274 Bolin testified that Eagle's activities in Daniels County were based on Eagle's research and was prompted by two pages of geological data forwarded to Eagle before Eagle met with Bumgardner. M.L. Hanson, a geologist who worked for Eagle from October 2011 through August 2013, corroborated Bolin's testimony. Hanson said that she had investigated the geology of Daniels County for about six months to a year beginning in December 2011. Hanson testified that she did not receive any maps from Bumgardner and considered the well logs that Bumgardner forwarded as being unusable due to their lack of detail.
But Eagle's witnesses also offered testimony that supported Shale's claims. Fairhurst was confronted with his prior deposition, in which he acknowledged that Eagle had not recently considered developing any prospects in Daniels County before Bumgardner had made his presentation. He conceded that no one other than Bumgardner and Tallis made formal presentations to Eagle about Daniels County. Bolin conceded that Eagle had never operated in Daniels County and devoted more effort to the evaluation of Bumgardner and Tallis's proposal than any other in the county.
Though Fairhurst said that Montana Lease decided where to acquire leases, counsel confronted Fairhurst with an e-mail in which he identified the target areas for Gentry. These targets were in the middle of Shale's prospect. Fairhurst agreed that Eagle purchased leases in the prospect. Bolin similarly testified that Eagle identified its area of interest for Montana Lease. Fairhurst conceded that Eagle had done no title work at the courthouse before it sought and acquired leases in Daniels County. Lucker likewise conceded that he never researched title ownership at the courthouse, notwithstanding the fact that the ownership of mineral rights in Daniels County is fractionalized.
Reasonable jurors could have concluded that circumstances surrounding Eagle's acquisition of mineral leases lent credence to Shale's claims. Eagle's negotiations with Gentry about mineral leases in Daniels County began in February 2012, the month that Eagle realized that it was not part of a deal with Shale. Montana Lease was formed four days before Eagle's lease-purchase agreement with it became effective. Nothing in Montana Lease's formation documents tied Eagle to Gentry. Montana Lease acquired its first lease that month, and acquired all but three of the leases that it ultimately would assign to Eagle Wes-Tex within six weeks of its formation. Eagle was the entity that paid Montana Lease to procure the leases. The leases were not recorded in the public record until July 2012.
Viewing all of this evidence in a neutral light, we cannot say that the jury's implicit finding that Eagle made unauthorized use of Shale's trade secrets was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we hold that factually sufficient proof of Eagle's unauthorized use supports the verdict.[1]
IV. Lost Profits
Eagle contends that Shale did not prove that it is entitled to lost profits damages because its expert's testimony failed to demonstrate lost profits with reasonable certainty. See Tex. Instruments v. Teletron Energy Mgmt. , 877 S.W.2d 276, 279 (Tex. 1994) (discussing "reasonable certainty"
*275 requirement). Eagle further contends that the jury's award was lower than the range of lost profits to which Shale's expert testified, and thus a new trial is warranted.
A. Standard of review
We review a trial court's rulings admitting expert testimony, including rulings on the reliability of expert testimony, for an abuse of discretion. Gharda USA, Inc. v. Control Sols., Inc. , 464 S.W.3d 338, 347-48 (Tex. 2015). If a party challenges an expert's opinion as incompetent and therefore no evidence, we review the entire record for legal sufficiency. Whirlpool Corp. v. Camacho , 298 S.W.3d 631, 638 (Tex. 2009). To constitute competent evidence, expert testimony must be based on a reliable factual foundation. See Houston Unltd., Inc. Metal Processing v. Mel Acres Ranch , 443 S.W.3d 820, 832-33 (Tex. 2014) ; Mack Trucks v. Tamez , 206 S.W.3d 572, 578 (Tex. 2006). There also must not be an analytical gap between the facts on which the expert relies and the expert's opinions. Gharda USA , 464 S.W.3d at 349 ; Mack Trucks , 206 S.W.3d at 578. The admission of testimony that does not meet these requirements is an abuse of discretion. Gharda USA , 464 S.W.3d at 347-48. Unreliable expert testimony is legally no evidence. Seger v. Yorkshire Ins. Co. , 503 S.W.3d 388, 410 n.23 (Tex. 2016) ; see also City of Keller , 168 S.W.3d at 813.
B. Applicable law
In a trade-secret case, with respect to the calculation of damages, "a measure of uncertainty is tolerated, and to an extent, unavoidable." Sw. Energy , 491 S.W.3d at 720. Lost profits need not be capable of exact calculation but must be proved by competent evidence with reasonable certainty. E.g. , itation case-ids="6794717" index="66" url="https://cite.case.law/sw3d/491/699/#p704">id. at 711 ; ERI , 318 S.W.3d at 876. Reasonable certainty bars speculation, but is otherwise an adaptable standard designed to meet the variety of circumstances in which claims for lost profits arise. Phillips v. Carlton Energy Grp. , 475 S.W.3d 265, 278-79 (Tex. 2015)
The standard requires estimates of lost profits to be based on objective facts, figures, or data, from which the amount of the loss can be determined. Sw. Energy , 491 S.W.3d at 711 ; ERI , 318 S.W.3d at 876. Lost profits are unrecoverable if there are too few facts to permit a jury to make a proper calculation. Sw. Energy , 491 S.W.3d at 712. Estimates also must concern net income-income minus expenses-rather than gross income. Miga v. Jensen , 96 S.W.3d 207, 213 (Tex. 2002). Although a plaintiff cannot recover lost profits that are hypothetical or hopeful, a defendant cannot avoid liability with respect to a claim for lost profits on the ground that the amount cannot be perfectly calculated. Phillips , 475 S.W.3d at 279-80.
C. Analysis
1. Expert testimony
Shale's expert witness, Jake Blubaugh, explained that Shale lost profits in two ways. The first consisted of 926 leases that Shale acquired at a higher cost because Montana Lease began competing for leases in the prospect. Montana Lease was Shale's only serious competitor for leases. Absent Montana Lease's competition, Blubaugh opined that Shale would have acquired the leases at a lower cost-and thus made a greater profit-when it later resold these leases to Apache for the fixed price of $800 per acre.
Montana Lease began to compete for leases in March 2012. Before that time, Shale's standard lease cost was $150 per acre for a five-year term. Leases that Shale acquired in the summer of 2011 cost about that much. Montana Lease offered *276 more favorable terms: it bid $250 per acre for a three-year term. As a result, Shale raised its standard offer to compete. Shale revised its standard offer to $325 per acre and later raised its offer even higher for some leases.
According to Blubaugh, Shale's increased costs in the form of higher acquisition payments corresponded to Montana Lease's competition, and resulted in between $15 to $25 million in lost profits. In calculating these figures, Blubaugh eliminated the leases that Shale had acquired for less than $300 per acre, as within the range of acquisition costs absent the competition.
Shale paid $300 or more per acre to acquire 926 of the leases it acquired. Blubaugh used $150, Shale's initial standard offer, and subtracted that figure from the increased cost Shale paid to acquire these leases to derive the higher end of the lost profits range. He calculated the lower end of the range in the same fashion, but he used $250 as the price that Shale otherwise would have paid. The $250 price was the highest price Shale had paid per acre for a lease before encountering competition. Overall, this presented a range of $15 to $25 million. The jury awarded $10,300,000.
The second category of lost profits consisted of the 35 leases that Montana Lease acquired within the prospect. Blubaugh opined that if Montana Lease had not bought these 35 leases, then Shale would have bought them and resold them to Apache at the agreed price of $800 per acre. He calculated that Montana Lease's acquisition of these 35 leases cost Shale $6 million in lost profits. Blubaugh derived this figure by multiplying the number of mineral acres associated with the 35 leases by $800, the price Apache would have paid Shale for them, and then subtracting $250 per acre, which was the highest cost Shale had paid per acre for a lease before Montana Lease began to acquire leases in the prospect. The jury awarded $4,000,000 in connection with this category.
2. Analytical gap
Eagle first contends that there is too great an analytical gap between the facts and Blubaugh's opinion to be competent expert testimony. Eagle contends that Blubaugh disregarded evidence that the increased lease acquisition costs were caused by other factors, and not by Montana Lease's competition for acquisition of them. Eagle points to evidence that (1) lease prices had begun to increase in Daniels County; (2) some competition for leases existed from other companies; (3) Apache insisted that Shale increase the amount of its lease proposals because it wanted to get the deal done within six months; and (4) drilling activity in the region had begun. Eagle further contends that Blubaugh's opinion about the second category of lost profits is speculative because he improperly assumed that that Shale would have acquired the 35 leases that Montana Lease acquired.
But, if credited, Shale adduced facts to support Blubaugh's analysis. Blubaugh opined that Shale had no serious competition other than Montana Lease. His opinion had support in the record. Multiple witnesses-Tallis, Hull, and Greehey-testified that Shale had no significant competition until Montana Lease began to acquire leases. Blubaugh acknowledged that other companies were leasing in the eastern part of Daniels County; he discounted this because it was not in the area where Shale concentrated its efforts. He also conceded that Apache urged Shale to increase its offers to interest owners but observed that the increase was in direct response to the competition posed by Montana Lease. This contention was supported by the testimony *277 of other witnesses, including Tallis and Greehey. Blubaugh thus opined that neither competition from others nor any other factor other than Montana Lease accounted for the substantially increased costs Shale incurred to acquire mineral leases. The lower end of his range of damages for these leases accounted for the highest price Shale had paid for leases before Montana Lease began competing.
As to the 35 leases acquired by Montana Lease, Blubaugh opined that the fact that the owners leased them makes it clear that they were willing to do so. Greehey testified that Apache bought every lease Shale offered for sale to it before Apache began drilling, and these leases were in the same primary area. Blubaugh's opinions thus rested on an adequate factual foundation. An expert's opinions need not be conclusive or based on undisputed or indisputable facts to be competent. Sw. Energy , 491 S.W.3d at 718 ; Transcon. Ins. Co. v. Crump , 330 S.W.3d 211, 218-19 (Tex. 2010).
Blubaugh explained how he reached his conclusions in lieu of the alternative possibilities preferred by Eagle. Having done so, his testimony was legally sufficient, and its weight relative to other evidence was for the jury to decide. Crump , 330 S.W.3d at 219.
3. Other expenses
Eagle contends that Blubaugh's calculation of lost profits for the 35 leases acquired by Montana Lease did not fully account for Shale's acquisition expenses because Blubaugh used the lease cost to calculate the difference and did not allocate any other expenses that Montana Lease may have incurred. Eagle, however, does not identify the expenses that were improperly unaccounted for in Blubaugh's calculation or refer to testimony or other evidence identifying expenses for which Blubaugh did not account. Blubaugh was obligated to provide a complete calculation, which requires accounting for expenses, but Eagle had the "burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credits." ERI , 318 S.W.3d at 878. Moreover, Eagle did not demonstrate that Shale would have incurred additional overhead expenses beyond the acquisition costs of these leases-Montana Lease's fixed costs were not additional costs that Shale would have incurred. The jury did not hear about any variable or incremental expenses incurred with obtaining additional leases beyond the purchase price. Because the evidence does not demonstrate that Shale would have incurred any expenses beyond the acquisition cost for each additional lease, Eagle has not demonstrated that the verdict is legally infirm.
Eagle points to our interim ruling that the trial court did not err in reducing the appeal bond. See Eagle Oil & Gas Co. v. Shale Expl., LLC , 510 S.W.3d 92, 95 (Tex. App.-Houston [1st Dist.] 2016, no pet.). In that ruling, we expressly stated that "we express no opinion on the ultimate characterization of the damages in this case after full appellate review." Id. Because the losses in this case directly correlated with increased costs as compared to a fixed sales price of $800 an acre from which to determine lost profits, the expert's opinion that subtracted the increased cost from $800 per acre to determine the loss of revenue to Shale fairly determines Shale's lost profits.
4. The jury's discretion to award less than requested
Finally, we reject Eagle's contention that we must disregard the lost profits finding because the jury's award was lower than the range of damages to which Blubaugh testified. A jury has the *278 discretion to award damages within the range of evidence at trial. See generally Sw. Energy , 491 S.W.3d at 713. The jury reasonably could have discounted Blubaugh's suggested range to account for the factors that Eagle adduced through cross-examination that lowered the actual losses attributable to Eagle's conduct, including the effect of other competition, the increased notoriety of the project, the desirability of the remaining leases, and fixed costs like administrative overhead. See ids="6794717" index="81" url="https://cite.case.law/sw3d/491/699/#p704">id. Eagle's expert testified that Blubaugh's damage model was unreasonable, effectively opining that Shale suffered no lost profits as a result of Eagle's conduct. The jury awarded $14,300,000 total in lost profits, which was within the range of the evidence at trial. See, e.g. , KMG Kanal-Muller-Gruppe Deutschland v. Davis , 175 S.W.3d 379, 396 (Tex. App.-Houston [1st Dist.] 2005, no pet.) (award that fell between the damage figures presented by the parties fell within the range of evidence at trial and was legally sufficient). The jury was required to award an amount within the range of evidence at trial, but was not restricted to make its finding within the higher range calculated by Blubaugh. See ids="8900233" index="83" url="https://cite.case.law/sw3d/175/379/#p396">id.
V. Discovery Sanctions
Eagle contends that the trial court erred in failing to strike a portion of Blubaugh's testimony as a sanction for Shale's failure to produce its lease files.
A. Standard of review
We review a trial court's decision striking or refusing to strike witness testimony as a discovery sanction for abuse of discretion. See Andras v. Mem'l Hosp. Sys. , 888 S.W.2d 567, 571 (Tex. App.-Houston [1st Dist.] 1994, writ denied) (citing Chrysler Corp. v. Blackmon , 841 S.W.2d 844, 849-50 (Tex. 1992) ); accord Van Heerden v. Van Heerden , 321 S.W.3d 869, 875-79 (Tex. App.-Houston [14th Dist.] 2010, no pet.).
B. Analysis
In response to Eagle's pretrial motion to compel, the trial court ordered Shale to produce its lease files for mineral interests in Daniels County in February 2014. Eagle contends that Blubaugh's testimony shows that Shale did not do so. At trial, Eagle objected to the admissibility of an exhibit of lease data taken from Shale's electronic lease database on the ground that the underlying lease files from which this data had been derived had not been produced. Because the parties then disputed whether the lease files in fact had been produced, the trial court overruled Eagle's objection but stated it would consider a post-trial motion to strike Blubaugh's testimony. As part of its motion for judgment notwithstanding the verdict, Eagle moved to strike Blubaugh's testimony due to Shale's failure to produce the files.
Shale did not produce the underlying leases. However, it maintains that the trial court did not err in failing to strike Blubaugh's testimony because, it contends, Blubaugh did not rely on the leases themselves, but on the data that Shale had gathered from them. Shale maintained that it could not produce the actual lease files as they were transferred to Apache and no longer in Shale's custody, possession, or control.
Blubaugh's trial testimony as to his reliance on the actual lease files was ambiguous. When Blubaugh was asked whether he relied on data from Shale's electronic database or the actual lease files, the following exchange occurred:
Q. Now, did you actually just crunch this data from the Land Boss Software or did you actually go into the actual lease files for these 926 leases *279 and see if there might have been something else that affected the increase besides Montana Lease Holdings?
A. I had to review each one of the leases.
Q. All right. And, so, how did you go about doing that?
A. I checked the terms, the activity notes, the dates, doublechecked anyone's that any problem popped out at me like the dates and checked the activity to see what's going on with that particular lease.
Similarly, the following exchange occurred when Blubaugh was asked about his exclusion of factors other than Montana Lease's competition:
Q. Okay. Did you actually physically go back and double check those leases and make sure the only leases you included were those impacted by the Montana Lease Holdings' activities?
A. Yes, sir. That's why I highlighted those [as] special interests and went back and reviewed a lot of detail to make sure that was the case.
At another point, he stated that he "reviewed every one of these leases individually" to assure himself that potential discrepancies as to their effective date versus when the lessors were paid was taken into account. After trial, Blubaugh filed a declaration stating that he relied on the lease data contained in Shale's electronic database, and that the underlying leases already had been transferred to Apache when he made his analysis.
Eagle does not contest Shale's contention that the leases were no longer in its possession, custody, or control in February 2014. Because Shale's duty to produce documents extended only to items within its possession, custody, and control, TEX. R. CIV. P. 196.3(a), the trial court acted within its discretion in determining that Eagle had not demonstrated discovery abuse. See Chrysler Corp. , 841 S.W.2d at 850. The trial court therefore did not abuse its discretion in denying Eagle's motion to strike Blubaugh's testimony as a sanction for Shale's failure to produce these documents.
VI. Jury Charge Challenges
Eagle contends that defects in the jury charge preclude Shale from recovering lost profits for misappropriation of trade secrets, namely (1) an incorrect cross-reference in the damages question, (2) the omission of a separate damages question for misappropriation of trade secrets, and (3) the commingling of valid and invalid theories of recovery in a single damages question.
A. Incorrect cross-reference
First, Eagle observes that the damages question incorrectly cross-references questions relating to the statute of frauds and promissory estoppel, rather that Shale's causes of action for breach of contract and misappropriation of trade secrets. Eagle maintains that this renders the jury's damages award invalid because the jury could not properly award lost profits damages based on a statute of frauds affirmative defense or a promissory estoppel claim. See Esty v. Beal Bank , 298 S.W.3d 280, 305 (Tex. App.-Dallas 2009, no pet.) (citing Fretz Constr. Co. v. S. Nat'l Bank , 626 S.W.2d 478, 483 (Tex. 1981) ) (lost profits are not recoverable under a promissory estoppel theory).
The trial court charged the jury with a single damages question, which was prefaced by a conditioning instruction. The jury was instructed to answer Question 7 on damages only if it first found that Eagle had breached its confidentiality agreement *280 with Shale in Question 5 or had misappropriated Shale's trade secrets in Question 6. The actual damages question that followed the conditioning instruction, however, incorrectly cross-referenced Questions 3 and 4, rather than 5 or 6:
If you answered "Yes" to Questions 5 or 6, then answer the following question. Otherwise, do not answer the following question.
QUESTION 7
What sum of money, if paid now in cash, would fairly and reasonably compensate Shale Exploration, LLC for damages, if any, that resulted from the conduct you found in response to Question 3 or Question 4.
In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.
Consider the following element[s] of damages, if any, and none other. Answer in dollars and cents for each of the following:
a. The amount of lost profits from the sale of leases acquired by Eagle Oil & Gas Co. within the Jayhawk Prospect that would have been acquired by Shale Exploration, LLC had Eagle Oil & Gas Co. not failed to comply with the confidentiality and non-circumvention agreement.
Answer: $4,000,000
b. The amount of lost profits from the difference in price for leases acquired within the Jayhawk Prospect by Shale Exploration, LLC because of Eagle Oil & Gas Co.'s failure to comply with the confidentiality and non-circumvention agreement.
Answer: $10,300,000
Questions 3 and 4 concerned Eagle's statute of frauds defense and Shale's promissory estoppel claim. Question 7 incorrectly asked the jury to decide damages resulting from the jury's findings on the statute of frauds or promissory estoppel.
The record shows that the incorrect cross-reference resulted from the incorporation of Shale's damages question into the court's charge without revision to reflect the renumbering of the questions.
Faced with a similar incorrect cross-reference in a jury charge, our sister court has held that a "verdict should not be reversed based on a typographical error" if the error is susceptible to commonsense detection by the jury. Bradford v. Vento , 997 S.W.2d 713, 730 (Tex. App.-Corpus Christi 1999), rev'd in part on other grounds , 48 S.W.3d 749 (Tex. 2001) ; see also Miller v. State , 846 S.W.2d 513, 514-15 (Tex. App.-Texarkana 1993, pet. ref'd) (holding that charge authorized jury to convict defendant of credit card offense even though charge was missing zero on card number where omission was most likely due to typographical error). We agree. The circumstances of this case demonstrate that the jury readily could have determined that Question 7's references to Questions 3 and 4 were incorrect. Question 7's first conditioning instruction correctly instructed that the jury could award damages only if it found that Eagle had breached a confidentiality agreement or misappropriated trade secret information. The later incorrect reference to Question 3, which concerned one of Eagle's defenses *281 rather than one of Shale's claims, would signal to reasonable jurors that the cross-reference was incorrect. The jury found for Shale on every claim it made and rejected Eagle's defenses and Eagle Wes-Tex's counterclaims. On this record, there is no indication that the jury was confused as to the bases on which it awarded damages. Therefore, we hold that this error was susceptible to commonsense detection by the jury and is not a basis for reversing the judgment.
B. The damages instructions
Second, Eagle asserts that Shale cannot recover lost profits for misappropriation of trade secrets because the damages question related back to the breach of contract claim rather than the misappropriation tort. Eagle contends that the charge's damages question permitted recovery of damages for breach of contract only, and not misappropriation, because it instructed the jury to award profits that Shale lost due to Eagle's failure "to comply with the confidentiality and non-circumvention agreement" but did not reference the finding for misappropriation of trade secrets. Eagle did not object to the instruction, but it contends that it was Shale's burden to tender a correct charge.
In support of its position, Eagle relies on the rule that a plaintiff waives a theory of recovery if it does not request the inclusion of that theory in the charge. See TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."). Rule 279, however, applies when the plaintiff has failed to request the submission of the legal theory or claim in its entirety. Id. ; see, e.g. , DeLanney , 809 S.W.2d at 495 (plaintiff waived contract claim where his requested jury questions only included negligence). In contrast, the charge in this case included a question submitting Eagle's liability for misappropriation of trade secrets and a corresponding damages question that was conditioned on an affirmative finding of common law misappropriation. Under these circumstances, Rule 279 requires this court to deem found an omitted element determinable from the verdict, for which there is sufficient evidence. See TEX. R. CIV. P. 279 ; Longview Energy Co. v. Huff Energy Fund , 533 S.W.3d 866, 875 (Tex. 2017) (deemed findings required when element of independent ground of recovery was submitted to and found by jury, other elements were omitted without objection, submitted element was necessarily referable to same ground of recovery as omitted elements, and sufficient evidence supported findings).
This principle applies to a single damages question predicated on alternative theories of liability, as the damages question in this case was. For example, in American National Petroleum Co. v. Transcontinental Gas Pipe Line Corp. , 798 S.W.2d 274 (Tex. 1990), the plaintiffs sued the defendant for breach of gas contracts and tortious interference with gas-related contracts they had with third parties. Id. at 275. The plaintiffs obtained a jury verdict in their favor under both theories of recovery. Id. at 275, 277. The charge included a damages question for breach of contract, but it did not have a separate damages question for tortious interference because the parties (mistakenly) agreed that the plaintiffs' damages were the same under either theory of recovery. See ids="9974299" index="99" url="https://cite.case.law/sw2d/798/274/">id. at 278. The Supreme Court held that the defendant, rather than the plaintiffs, waived any error resulting from the failure to include a damages question for tortious interference. Citing Rule 279 and prior decisions, the Court observed that a "cluster of jury questions on tortious *282 interference was submitted to the jury" and concluded that the defendant's "failure to object to the omission of a tort damages question as part of that cluster alone waived the requirement of submitting the correct damages issue to the jury." Id. Thus, the defendant was "bound by a deemed finding of actual tort damages" so long as it was supported by sufficient evidence. Id. at 278-79 ; accord Valley Nissan v. Davila , 133 S.W.3d 702, 712 (Tex. App.-Corpus Christi 2003, no pet.) ; Transmission Exch. Inc. v. Long , 821 S.W.2d 265, 272 (Tex. App.-Houston [1st Dist.] 1991, writ denied).
Accordingly, while Eagle is correct that the lone damages question referred to lost profits resulting from its failure "to comply with the confidentiality and non-circumvention agreement," Eagle was obligated to bring the omission of a separate damages question on misappropriation of trade secrets to the trial court's attention through objection or tender of an alternative damages measure to the extent that it contends a different measure of damages should have been included in the charge. See TEX. R. CIV. P. 279 ; Longview , 533 S.W.3d at 875 ; Am. Nat'l Petrol. , 798 S.W.2d at 278-79. Eagle's own proposed instructions on lost profits included the same elements of damages that were included in the charge. Because we have found Eagle's challenges to the expert testimony unavailing, legally and factually sufficient evidence supports Shale's claim for lost profits resulting from Eagle's misappropriation of trade secrets. The damages assessed were conditioned on a finding of misappropriation and thus refer to that liability finding as well. We hold that the damages instruction does not invalidate the jury's finding as it relates to trade secret misappropriation. See TEX. R. CIV. P. 279 ; Longview , 533 S.W.3d at 875 ; Am. Nat'l Petrol. , 798 S.W.2d at 278-79.
Any error resulting from the omission of a separate damages question as to misappropriation of trade secrets was harmless in this case. The measure of actual damages was the same under either of Shale's theories of recovery. Eagle does not contend otherwise. Thus, the trial court's charge did not probably cause the rendition of an improper judgment and presents no basis for reversal. See TEX. R. APP. P. 44.1(a) ; Hernandez v. Am. Appliance Mfg. Corp. , 827 S.W.2d 383, 388 (Tex. App.-Corpus Christi 1992, writ denied) (charge error harmless if its correction would result in same judgment).
C. Commingling of valid and invalid theories
Third, Eagle asserts that Shale submitted a single damages question for multiple theories of recovery, in which it commingled valid and invalid theories of recovery, thereby making it impossible to ascertain whether the invalid theories were the sole basis for the jury's findings. See Crown Life Ins. Co. v. Casteel , 22 S.W.3d 378, 389 (Tex. 2000) ; see also Harris Cty. v. Smith , 96 S.W.3d 230, 234-35 (Tex. 2002). Eagle contends that the damages question impermissibly commingles theories of recovery for breach of contract, promissory estoppel, and misappropriation of trade secrets as well as including its statute of frauds affirmative defense as a possible ground of recovery.
But the Casteel rule is inapposite. It applies when a jury "bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories," Casteel , 22 S.W.3d at 388, or bases a damages award on a single broad-form question on damages that commingles valid and invalid elements of damages. Harris Cty. , 96 S.W.3d at 234 ; see also Romero v. KPH Consolidation, Inc. , 166 S.W.3d 212, 227-28 (Tex. 2005) (error *283 in commingling invalid theory of liability in apportioning responsibility). This charge does neither. It included separate liability questions on Eagle's contract, promissory estoppel, and misappropriation theories. Thus, even if one or more of these theories of liability were invalid, they were not commingled. See Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture , 50 S.W.3d 531, 549 (Tex. App.-El Paso 2001, no pet.) ( Casteel inapplicable where separate liability questions were submitted on each of plaintiff's causes of action even if one cause of action was invalid). The charge included a single question on damages; however, Shale sought recovery for the same damages under each of its theories of liability, and the two distinct elements of its alleged damages-two categories of lost profits-were submitted separately within the damages question. Thus, even if one or both of these elements of damages were invalid, they likewise were not commingled. See Matbon, Inc. v. Gries , 288 S.W.3d 471, 484 (Tex. App.-Eastland 2009, no pet.) ( Casteel inapplicable if charge does not contain broad-form damage question commingling multiple elements of damages); Durban v. Guajardo , 79 S.W.3d 198, 207 (Tex. App.-Dallas 2002, no pet.) ( Casteel inapplicable when damages are the same for multiple causes of action). Because we have held that the evidence supports both a valid legal theory and the damages awarded, we hold that Eagle has failed to demonstrate harmful Casteel error.
VII. Exemplary Damages
Eagle contends that the evidence of malice-a specific intent to cause substantial injury-required to support the jury's award of exemplary damages is legally and factually insufficient.
A. Exemplary damages standard
A plaintiff may recover exemplary damages based on a claim for misappropriation of trade secrets under the rules ordinarily applicable to exemplary damage awards. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. i (1995); see generally Horizon Health Corp. v. Acadia Healthcare Co. , 520 S.W.3d 848, 871-81 (Tex. 2017) (holding that exemplary damages awarded were excessive in case involving misappropriation of trade-secret items). Thus, to recover exemplary damages, Shale had to prove by clear and convincing evidence that the lost profits it suffered resulted from malice. TEX. CIV. PRAC. & REM. CODE § 41.003(a). To prove malice, Shale had to marshal clear and convincing proof that Eagle specifically intended to cause Shale a substantial injury. Id. § 41.001(2), (7). Because misappropriation of trade secrets is an intentional tort, see Dallas Nat'l Ins. Co. v. Sabic Ams., Inc. , 355 S.W.3d 111, 119 (Tex. App.-Houston [1st Dist.] 2011, pet. denied), the intent to commit the tort alone cannot justify an award of exemplary damages. See Safeshred, Inc. v. Martinez , 365 S.W.3d 655, 662 (Tex. 2012) ; see also Cont'l Coffee Prods. Co. v. Cazarez , 937 S.W.2d 444, 454 (Tex. 1996) (wrongdoing associated with intentional tort did not in itself satisfy heightened standard required for exemplary damages); Transp. Ins. Co. v. Moriel , 879 S.W.2d 10, 18 (Tex. 1994) (all torts involve wrongful conduct, but tortious conduct standing alone is not a basis for exemplary damages). Rather, the substantial injury Eagle intended must be independent and qualitatively different from the compensable harms associated with Shale's claim for misappropriation of trade secrets. Horizon Health , 520 S.W.3d at 867 ; Moriel , 879 S.W.2d at 19. Eagle's conduct also must have been outrageous, malicious, or otherwise reprehensible. Horizon Health , 520 S.W.3d at 867. Exemplary damages "are proper only in the most *284 exceptional cases." Moriel , 879 S.W.2d at 18.
B. Standard of review
Because the standard of proof for malice-clear and convincing evidence-is elevated, so is the standard of review. Sw. Bell Tel. Co. v. Garza , 164 S.W.3d 607, 616-27 (Tex. 2004). A jury may not find malice based on evidence of lesser quality and we therefore cannot affirm a finding of malice on such evidence. See ids="9010090" index="127" url="https://cite.case.law/sw3d/164/607/#p616">id. at 624-25.
In a legal sufficiency review of the evidence to support a finding that must be proved by clear and convincing evidence, we review all of the evidence in the light most favorable to the verdict to ascertain whether a reasonable jury could have formed a firm belief or conviction that the finding was true. Horizon Health , 520 S.W.3d at 866. We assume that the jury resolved disputed facts in favor of the finding if a reasonable jury could do so. Id. We disregard all evidence that a reasonable jury could have disbelieved other than undisputed facts that do not support the finding. In re J.F.C. , 96 S.W.3d 256, 266 (Tex. 2002).
In a factual sufficiency review of the evidence to support a finding that must be proved by clear and convincing evidence, we must give due consideration to evidence that the jury reasonably could have found to be clear and convincing. Id. Like a legal sufficiency review, the proper inquiry is whether a reasonable jury could have formed a firm belief or conviction that the finding was true. Id. However, we must consider whether disputed evidence is such that a reasonable jury could not have resolved that disputed evidence in favor of its finding. Id. If the disputed evidence that a reasonable jury could not have credited in favor of the finding is so significant that the jury could not have formed a firm belief or conviction, then the evidence is factually insufficient. Id.
C. Evidence of malice
There was evidence from which the jury reasonably could have inferred that Eagle tried to conceal that it was acquiring mineral leases within the prospect. Eagle arranged to have a company without obvious connections to it acquire leases, which were not assigned to Eagle Wes-Tex in the public record until July 2012. When Greehey initially contacted Bolin asking that he confirm or deny that Eagle was leasing in the prospect, Bolin stated that Eagle had the right to do so, but he did not confirm or deny that Eagle was doing so. When Looney asked the same of Fairhurst, Fairhurst denied that Eagle was leasing in Daniels County. Fairhurst explained that he did so because Shale and its partners were contentious and he did not want to supply them with any information that they could use against Eagle.
Shale relies on the late recording of the leases in the public records and testimony from Shale's own president, Sam Tallis, to support a finding of malice. Tallis believed that Eagle's purchasing activity was designed to prevent Shale from drilling. As he put it, "what they're doing is they're busting up our drilling units where they can hold us hostage."
Tallis's conclusory characterization of Eagle's motive is not sufficient to prove malice. See Smith v. O'Donnell , 288 S.W.3d 417, 424 (Tex. 2009) (conclusory statements of expert and counsel held insufficient to support finding of malice). While the evidence supports the jury's finding that Eagle misappropriated Shale's trade secrets, there is not evidence that Eagle intended to cause Shale a substantial injury "independent and qualitatively different" from the compensable harms associated *285 with its misappropriation of Shale's trade secrets. See Horizon Health , 520 S.W.3d at 867 (court of appeals erred in relying on "evidence of the tort itself, with little more, to support the jury's finding" of malice); cf. Bennett v. Reynolds , 315 S.W.3d 867, 869-72 (Tex. 2010) (cattle theft by defendant in context of longstanding feud with plaintiff, accompanied by false accusation against plaintiff and attempt to mislead law enforcement, and done despite third party's warning that cattle belonged to someone else satisfied malice standard). The limited evidence of Bolin's and Fairhurst's obfuscation as to Eagle's leasing activities is both quantitatively and qualitatively insufficient to sustain an award of exemplary damages against the company. See Safeshred , 365 S.W.3d at 665 ; cf. Horizon Health , 520 S.W.3d at 867-71 (detailing evidence other than that supporting underlying torts showing that several individual defendants each intended to substantially harm plaintiff); Bennett , 315 S.W.3d at 883-85 (relying on "ample evidence" that company's president who ran day-to-day operations used company and its employees, land, and equipment to steal cattle).
Shale adduced no evidence that Eagle caused Shale an injury independent of and qualitatively different than the misappropriation itself. Although Shale lost profits on the Apache deal, Eagle's conduct did not cause the deal to fail or Apache to "walk away." There was no evidence that Eagle's misappropriation prevented any drilling in the prospect. Apache drilled several wells, but the wells did not yield the results that Apache desired. Leaving aside Tallis's characterization, Shale adduced no evidence of Eagle's conduct beyond the purchase of leases within the prospect-which defined Eagle's claim for misappropriation and lost profits. Eagle's intentional misappropriation and misuse of Shale's trade secrets is not legally sufficient evidence of malice. If it were, exemplary damages would be recoverable as a matter of course in every misappropriation case, rather than the exceptional case involving egregious misconduct and injury. See Safeshred , 365 S.W.3d at 662 ("A malice finding must require more than Safeshred's mere intent to fire Martinez, or else every Sabine Pilot claim would warrant punitive damages."); Cont'l Coffee , 937 S.W.2d at 454 ; Moriel , 879 S.W.2d at 18. An award of exemplary damages based on these "unrealized consequences" would impermissibly punish Eagle for harm that Shale "never actually endure[d]." Safeshred , 365 S.W.3d at 664.
Shale did not prove by clear and convincing evidence that the intent underlying Eagle's wrongful conduct was of the exceptional nature necessary to support a finding of malice and an award of exemplary damages. See Moriel , 879 S.W.2d at 18. Because the record lacks clear and convincing evidence of an intent on Eagle's part to inflict substantial injury independent and qualitatively different than the compensable harms associated with the misappropriation of Shale's trade secrets, we hold that the evidence is legally insufficient to support the jury's finding of malice. See Horizon Health , 520 S.W.3d at 867 ; Safeshred , 365 S.W.3d at 662. Accordingly, we reverse the award of exemplary damages.
VIII. Counterclaims
Eagle Wes-Tex contends that the evidence is legally and factually insufficient to support the jury's adverse findings on its counterclaims for tortious interference with its contract with Montana Lease, tortious interference with its prospective contractual or business relationships, and civil conspiracy.
*286 To successfully challenge the legal sufficiency of an adverse finding on which it bore the burden of proof, a party must show that the evidence conclusively proves all vital facts in support of the issue. Dow Chem. Co. v. Francis , 46 S.W.3d 237, 241 (Tex. 2001) ; Pham v. Harris Cty. Rentals, L.L.C. , 455 S.W.3d 702, 709 (Tex. App.-Houston [1st Dist.] 2014, no pet.). To successfully challenge the factual sufficiency of an adverse finding on which it bore the burden of proof, a party must show that the finding is against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. Francis , 46 S.W.3d at 242 ; Pham , 455 S.W.3d at 709.
However, to raise these issues, a party's brief must include "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Failure to cite any authority in support of a contention waives the contention. Cooke v. Morrison , 404 S.W.3d 100, 108 (Tex. App.-Houston [1st Dist.] 2013, no pet.). We will not independently research the law and analyze the record to assess the merit of an inadequately briefed appellate issue. Happy Harbor Methodist Home, Inc. v. Cowins , 903 S.W.2d 884, 886 (Tex. App.-Houston [1st Dist.] 1995, no writ).
Eagle Wes-Tex challenges the jury's adverse findings on three distinct causes of action. But it neither identifies the elements of these causes nor cites any authority from which the elements it challenges may be gleaned. Eagle Wes-Tex does not explain how the evidence conclusively proved these unidentified elements or how the great weight and preponderance of the evidence as to these elements contradicted the jury's findings. Eagle Wes-Tex therefore does not present these evidentiary sufficiency issues for appellate review. In any event, the same evidence that the jury credited in finding liability for misappropriation of trade secrets undercuts the argument that the jury's rejection of Wes-Tex's counterclaims was against the great weight of the evidence.
CONCLUSION
We reverse the award of exemplary damages. We affirm the remainder of the judgment of the trial court.
Jennings, J., dissenting in part.

Because we affirm the judgment on Shale's misappropriation claim, we need not consider Eagle's assignments of error relating to the jury's finding that Eagle breached the written confidentiality agreement.